# Illinois Official Reports

## Appellate Court

---

**People v. Alvidrez, 2014 IL App (1st) 121740**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE ALVIDREZ, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1740 |
| Filed | October 15, 2014 |
| Rehearing denied | November 25, 2014 |
| Modified upon denial of rehearing | December 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed defendant's conviction and sentence for the first degree murder of his 18-month-old son, who suffered a severe head injury while in the care of defendant, since the trial court did not err in barring defendant's expert from offering testimony with respect to the force necessary to bring about the type of injuries suffered by the victim and the closing and rebuttal arguments of the prosecution did not prejudice the jury by improperly disparaging the character of defendant and his expert; however, the clerk of the circuit court was directed to correct the mittimus and defendant's fines and costs to reflect the correct amount of presentence custody credit and the proper fines and costs. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-3880; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected; fines and fees order corrected. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Emily E. Filpi, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Hyman and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Jose Alvidrez was tried and found guilty by a jury of the first degree murder of his 18-month-old son, Joshua Alvidrez, who died as a result of a severe head injury suffered at home while under defendant's care. Defendant was sentenced to 25 years' imprisonment and now appeals, contending the trial court erred when it precluded his expert from testifying about the amount of force required to cause Joshua's brain injuries. Defendant also contends that the State engaged in prosecutorial misconduct during its closing and rebuttal arguments by disparaging his character and that of his expert, thereby prejudicing the jury. Lastly, defendant contends that he is entitled to additional days of presentence credit and that the trial court improperly levied various fines, fees and costs against him. We affirm.

¶ 2                                                    BACKGROUND

¶ 3      Defendant was charged with first degree murder after his son Joshua perished due to a severe head injury. Defendant maintained that the child fell off an adult bed from about a knee-high distance to the bedroom floor, but the State presented evidence demonstrating that the extent of bruising, brain damage and retinal trauma Joshua suffered would only be attributable to severe physical abuse and would not occur during the type of fall described by defendant. The State's case rested on circumstantial evidence that defendant shook and/or beat his child to death within a one-hour time span when no other individuals were present. That circumstantial evidence was coupled with the testimony of several treating physicians who opined that Joshua was the victim of severe abuse that could not have possibly occurred in a simple fall from a bed onto a carpeted hardwood floor.

¶ 4      Summarized at some length, testimony at trial revealed the following. Benita Jorge was Joshua's mother and defendant's girlfriend. On January 10, 2008, as was her then-current routine, she left Joshua in defendant's care and went to work for the Cook County Youth Outreach Services, where she oversaw screening cases coming into the system through the child abuse hotline. Up until about October 2007, Joshua had a babysitter, but thereafter defendant and Corina Gonzalez (girlfriend of defendant's cousin) became his caretakers. Other

than a small bruise on the innermost corner of Joshua's left eye, Joshua appeared a happy and healthy baby on January 10. On that date, Corina left for the library, leaving defendant alone in the apartment with Joshua for about an hour. According to defendant, it was at that time that he placed Joshua on an adult bed for a nap, propping him on pillows and covering him with a comforter. Defendant then went across the hall to shave for some 15 minutes. Although he did not hear anything, upon returning, he found Joshua on the floor, facedown with the blanket covering his lower legs, but his feet still on the bed. Believing Joshua was simply "knocked out," defendant patted his cheeks and called his name. Joshua was unresponsive, but breathing.

¶ 5        Defendant testified that he then called Benita. Benita testified that defendant reported he had "found Joshua on the floor" and "he's not waking up." Benita told defendant to splash water on Joshua because "it works in the movies." Defendant did so, taking him into the shower, where Joshua apparently had a bowel movement, something defendant claimed to have not noticed until days later when he again reviewed the scene. Joshua opened his eyes, moaned, and then started to cry, according to defendant. Benita subsequently heard Joshua say "mom" after some whimpers. At that point, she believed Joshua was not harmed. Defendant testified that Joshua "looked fine." Reading from the Mayo Clinic website, Benita nonetheless instructed defendant to prevent Joshua from falling asleep in the event he had a concussion. Defendant again placed Joshua on the bed, propping him up with pillows. Defendant testified Joshua at that time could point to his nose, chin, and eyes. Corina, who had been gone for about an hour, returned from the library and entered the bedroom to ask defendant to look over a resume. As defendant was doing so, Corina gave Joshua a sippy cup, from which he drank.

¶ 6        Some 30 minutes later, Benita called to check on Joshua. Defendant testified that he went to retrieve the phone and on his return to the bedroom found Joshua with eyes rolled back in his head and stiff like a board. Defendant picked Joshua up from under his arms and shook him, repeatedly calling his name. Defendant denied severely shaking, throwing or shoving Joshua at that or any other time. Joshua then began to claw at his own face with one finger reaching under his eyelid and was grinding his teeth. Defendant testified that he held Joshua's arms to prevent the clawing. Defendant then took Joshua into the shower again, to no beneficial effect. At this time, Benita talked with her doctor, who instructed her to call 911. Benita called defendant back and told him to call 911, which he did.

¶ 7        Joshua was unresponsive when the ambulance arrived minutes later. He was placed in a cervical collar, securing his head and neck and transported to Cook County Stroger Hospital (Stroger), where diagnostic testing revealed, among other traumas, an extensive subdural hematoma (bleeding from the brain under the dura, inside the skull) requiring a craniotomy to relieve intracranial pressure. Despite the best efforts of medical personnel, on January 18, 2008, Joshua was pronounced dead. The authorities and defendant then did a "walk-through" at the house, with defendant describing the events of the incident. Thereafter, defendant was arrested and charged with the present offense.

¶ 8        On the crucial issue of the cause of the child's injuries and death, defendant's trial was mostly a quintessential battle of experts, with several treating physicians testifying that Joshua's injuries could not have been anything but intentionally caused, and defendant's retained medical pathology expert stating the injuries could have resulted from an accidental fall as described by defendant. In particular, the State presented the testimony of Dr. Amanda Fingarson, then a fellow doing specialty training in child abuse pediatrics at Stroger, who examined Joshua following his craniotomy. The State also presented the testimony of

- 3 -

Dr. Abayomi Akintorin, Joshua's attending physician who for 22 years had worked as a pediatric intensive care specialist and anesthesiologist. When Dr. Akintorin saw Joshua, the child was in a medically induced coma and near death. Both physicians observed bruises on Joshua's body, arms, and chin. As part of the child's care, Dr. Fingarson interviewed defendant, who appeared devoid of much emotion, which she found atypical, and Dr. Fingarson remained convinced that "the bruises were certainly not explained and were a concerning finding in and of themselves." That is, they were not located in places where toddlers would naturally incur bruises.

¶ 9        Even though defendant claimed to have found Joshua facedown on the floor, potentially indicative of an accidental fall, Dr. Fingarson noted that chest bruising was actually rare in accidental trauma. She also testified that the torn vessels and extensive subdural hematoma on Joshua's brain were quite consistent with major trauma to the head, while being markedly inconsistent with a shortfall (defined as a fall from a caregiver's arms or changing table). She explained that a child falling facedown would instinctively extend his arms to prevent a head injury. In fact, a study of over 1 million children concluded that the likelihood of death from a shortfall in children was less than 1 in 1 million. Dr. Fingarson opined that Joshua's injuries resulted from physical abuse, and in particular, abusive head trauma from shaking the child or slamming the child against something, since there were elements of blunt impact trauma and intracranial evidence of acceleration and deceleration injury. Dr. Akintorin likewise testified that many of the children he encountered with traumatic brain injury suffered so because of shaken baby syndrome. Dr. Akintorin referred the case to an ophthalmologist because he found the reports that Joshua had fallen from a knee-high level were inconsistent with the degree of "massive" injuries Dr. Akintorin observed. This led him to also suspect a "non-accidental" injury or child abuse in the form of shaken baby syndrome.

¶ 10        Dr. Phillip Dray was the aforementioned ophthalmologist who examined Joshua and confirmed that he discovered various "flame shaped" retinal hemorrhages in Joshua's eye. Dr. Dray opined that, given the degree of severity in the retinal hemorrhages, the cause was either abusive head trauma or leukemia, but the latter was medically ruled out in Joshua's case. In his 30 years of experience, he had never seen a fall from less than 10 feet cause such an injury, but he had seen a two-story fall cause it. He testified it would be impossible for a fall from five feet to cause the injury and that falls off a bed or even down a short flight of stairs would not be a competent cause for the type of bleeding inside the eye and disruption of tissue seen in Joshua. Dr. Dray acknowledged that a very small minority, said to be roughly six doctors, believed shortfalls could cause retinal hemorrhaging. Dr. Akintorin testified that the traumatic head injury, together with the retinal hemorrhages, were typically present when a child was violently shaken.

¶ 11        Dr. Mitra Kalelkar was the medical examiner for Joshua. After reviewing all the medical records and ancillary studies and performing the autopsy, she opined that Joshua died as a result of blunt head trauma and that the manner of death was a homicide.

¶ 12        The State rested, and the defense called Dr. John Plunkett, an expert in general pathology and forensic pathology with some 33 years of experience. Dr. Plunkett had testified in court as an expert over 200 times and specifically on the mechanics of infant head injury at least 75 times. While he had testified for both the prosecution and the defense as a paid expert, Dr. Plunkett acknowledged that he primarily served as an expert for the defense. Although he published numerous articles relating to children or infants, he had never specialized in

pediatrics and had not treated children since 1978. In particular, he had never diagnosed a child with shaken baby syndrome. In terms of his professional publication, there was considerable time spent discussing a 2004 article entitled, "Biomechanical Analysis of Causes of Traumatic Brain Injury," which he co-authored with a biomechanical engineer. Dr. Plunkett acknowledged that while he understood biomechanics as they related to injury evaluation, he was not a biomechanical engineer and was not formally educated as a biomechanical engineer. Shortly after publication of this article, Dr. Plunkett became a full-time consultant on forensic matters in various states.

¶ 13    Dr. Plunkett testified there was no definitive way to determine whether Joshua fell from the bed or sustained an impact injury from another individual or mechanism. In other words, the injuries themselves could not be used to determine the cause. Nonetheless, after reviewing Joshua's full medical records, Dr. Plunkett opined that if Joshua had been standing on the bed and had fallen, striking the nightstand or the floor, that could have caused the subdural hematoma and brain swelling. This, in turn, could have led to the retinal hemorrhaging. In support, Dr. Plunkett cited an article he wrote in 2001, wherein he conducted a study of 18 shortfalls on playground equipment (heights between about 2 feet and 8 feet) leading to fatalities. This data was from three files from the United States Consumer Product Safety Commission. Four out of the six children who were checked for retinal hemorrhaging had them. Dr. Plunkett also cited several other anecdotal studies to support his opinion. He opined that intracranial pressure from the brain swelling caused the retinal hemorrhaging. In sharp contrast to the State's witnesses, he opined there was no difference in how intracranial pressure would affect a child of Joshua's age versus an adult. Dr. Plunkett concluded that given Joshua's weight of 26 pounds and Dr. Plunkett's knowledge of shaken baby syndrome, it would not have been possible for shaking to cause Joshua's injuries. He went so far as to testify that Joshua would have been "decapitated" before anyone shaking the child could cause the type of brain injury Joshua sustained.

¶ 14    Dr. Plunkett was of the opinion that the bruises on Joshua's chin and the back of his head were not trauma from any domestic incident, but had likely been caused by the cervical collar placed on Joshua by the emergency responders. He also testified the bruising on Joshua's chest could have resulted from medical devices utilized during surgery. Dr. Plunkett opined that given Joshua's medical state some hours after being admitted to the hospital, he would have been more prone to bruising. He related that Joshua's mother had a history of easy bruising; Benita in fact had told the medical staff that Joshua bruised easily. The bruise on Joshua's arm also was most likely caused by the blood pressure cuff, in Dr. Plunkett's judgment.

¶ 15    In its rebuttal case, the State called Dr. Michelle Lorand, the attending physician at Stroger in the department of pediatrics who was chair of the division of child protective services and who had supervised Dr. Fingarson's care of Joshua. She had treated "tens of thousands" of children during her career at Stroger, including children who had fallen off beds. Dr. Lorand specifically disagreed with Dr. Plunkett's opinions on the etiology of Joshua's bruising. Contrarily, she opined the brain injuries, including torn cortical matter, were "indicative of significant trauma." Torn cortical matter, together with the bruises, subdural hemorrhage, and torn and bleeding vessels, could not, in her medical opinion, have resulted simply from falling off of a bed, even accounting for the defense theory, espoused by Dr. Plunkett, that Joshua had been standing and may have hit his head on a piece of furniture while falling to the floor.

¶ 16    Instead, Dr. Lorand testified, the injuries were a consequence of shaking and impact. She testified the defense theory in fact was contrary to the literature and cited studies that analyzed thousands of children with reported falls, without a single child suffering injuries similar to Joshua's. One study analyzed 800 infants with falls in the nursery/delivery room, while another involved more than 500 children who fell out of cribs in hospitals, with none receiving "deep brain injuries" or a subdural hemorrhage like Joshua's. Dr. Lorand explained that while Dr. Plunkett's published anecdotal case report was noteworthy, the sample of children reviewed was not statistically significant in a manner that could affect clinical decision-making. Dr. Lorand also disagreed that intracranial pressure could cause retinal hemorrhages because that particular medical phenomenon (Terson's syndrome) was known to only affect adults. Dr. Lorand further disagreed with Dr. Plunkett's assertion regarding decapitation. She explained that Dr. Plunkett was relying on biomechanical calculations, but nobody had been able to credibly simulate such an experiment.

¶ 17    Following evidence and argument, the jury found defendant guilty of murder. Defendant filed a posttrial motion challenging the verdict, which the court denied, and he was sentenced to 25 years' imprisonment. This timely appeal followed.

¶ 18                                    ANALYSIS

¶ 19    Defendant first contends the trial court impermissibly infringed on his constitutional right to present a defense by limiting the testimony of his defense expert, Dr. Plunkett, thus warranting reversal of defendant's conviction and a new trial. Defendant argues this limitation occurred when defense counsel was asking whether, in the context of this child being shaken to the extent of causing the injuries actually inflicted, "[W]ould you expect to find any other injuries on him?" Dr. Plunkett responded, "Well, if someone is able to hold a 26 pound baby in front of him or her and shake him hard enough to cause brain injury, it would require you to be able to shake him at approximately 10 or 12 cycles per second, 10 or 12–" At this point, the State successfully objected to the clearly nonresponsive answer. The capable defense attorney next asked, "[W]hat other injuries would you expect to find in Josh?" As alluded to above, Dr. Plunkett testified he would expect Joshua to be "decapitated" before causing such brain damage.

¶ 20    Despite the fact that this specific medical theory was uttered in testimony, defendant now argues that the trial court's ruling on the nonresponsive answer amounted to an impermissible and prejudicial "limitation" on his expert's testimony which deprived the jury of the chance to consider the very theory that the witness testified about in open court. Specifically, it is urged in this court that the witness would have offered testimony about the amount of "g forces" that would be required to inflict this level of trauma. Notably, the State had earlier noted an objection to Dr. Plunkett testifying about biomechanical engineering matters beyond his medical training. More to the point, defense counsel did not attempt to ask a specific question on that subject after the court sustained the State's objection, and the record reveals that defendant never made an offer of proof that could be referenced to determine in what way this examination was hindered.

¶ 21    In the absence of an offer of proof, defendant instead leans on his posttrial motion and Dr. Plunkett's appended report, in which he stated, "[a] person 'shaking' a 26-pound toddler would have to exert a force of 260 pounds *to the chest or arms* in order to accelerate the head at 10g's, an acceleration well below any established threshold for SDH or traumatic brain

damage." (Emphasis in original.) Defendant argues this statement from his expert's pretrial report somehow constitutes an offer of proof and testimony rebutting that of Dr. Dray, who opined that the alleged perpetrators of shaken baby syndrome are "sufficiently strong" to produce the brain and eye injury.

¶ 22     Put bluntly, this legal construction is both disingenuous and nonsensical. First, as the State asserts, defendant failed to timely and properly object to this so-called limitation of his expert's testimony because he did not contemporaneously complain of the alleged error, and he did not request a side bar or submit a timely offer of proof. Instead, counsel proceeded in his examination and nonetheless got the gravamen of his theory (minus the "g-force" statistics) in front of the jury for its consideration. Were there any actual error, the trial court was deprived of an opportunity to cure it, and this issue has been waived. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (requiring both an objection at trial and posttrial); see also *People v. Andrews*, 146 Ill. 2d 413, 421 (1992) ("The failure to make an adequate offer of proof results in a waiver of the issue on appeal.").

¶ 23     Even more damning to defendant's argument is the fact that Dr. Plunkett acknowledged that he was not a biomechanical engineer and had no formal education in biomechanical engineering. His main familiarity with the subject came via his association with his co-author (a trained biomechanical engineer) of the above-referenced published article that seems to have launched his career as a forensic consultant. Thus, he was in no way qualified to render the opinion that defense counsel never asked him for in open court, despite the fact that it may have been in his written report. When the court qualified Dr. Plunkett as an expert in general pathology and forensic pathology, defense counsel did not contest that characterization or seek to further qualify his expert. Counsel thus again waived any complaint regarding limiting Dr. Plunkett's testimony on a subject matter in which Dr. Plunkett clearly held no expertise. It is axiomatic that a trial court's evidentiary rulings will not be disturbed absent a clear abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). The subject matter here was couched in biomechanical terms that he was clearly not qualified to render and would not have assisted the jury in understanding the evidence or made the question of defendant's guilt more or less probable. See *Wheeler*, 226 Ill. 2d at 132 (noting rule); *Thompson v. Gordon*, 221 Ill. 2d 414, 429 (2006) (noting rule); see also *People v. Enis*, 139 Ill. 2d 264, 285 (1990) (noting the expert testimony would not have contributed at trial).

¶ 24     This is because Dr. Plunkett testified that based on Joshua's weight and his knowledge of shaken baby syndrome, it would not have been possible for defendant to cause Joshua's injuries. To support this opinion, he cited reconstruction of real life events (as with the automotive industry) and experimental studies, where the stretch of the brain was studied. Significantly, he opined that to cause the injuries Joshua sustained, defendant would have had to shake Joshua to such a degree that he would have been decapitated. Not to put too fine a point on it, one struggles to imagine that the thought of decapitation was somehow insufficient and that the omission of g-force statistics prevented this defendant from presenting his defense. The jury considered this dramatic medical theory and apparently rejected it. Based on the foregoing, we conclude there was no error and, as more fully explained below, no plain error in this case.

¶ 25     Defendant next argues that the prosecutor made inaccurate and improper remarks during the State's closing argument and the cumulative effect of the remarks denied him a fair trial. At the outset, we note that defendant failed to object to the issues he now raises. Objections to

closing argument must be made at trial to be preserved for review. *People v. Coulter*, 230 Ill. App. 3d 209, 229 (1992). Raising some or all the issues in a posttrial motion is insufficient to preserve them for appeal. See *People v. Naylor*, 229 Ill. 2d 584, 592 (2008) (*both* a trial objection and a written posttrial motion raising the issue are required). Nonetheless, defendant argues the alleged errors constitute plain error, mandating reversal. This narrow and limited exception to the general rule of procedural default allows a reviewing court to consider unpreserved error where the evidence is closely balanced, such that the error threatened to tip the scales of justice against the defendant, or where the error is so serious that it challenged the integrity of the judicial process. *Id.* at 593. "There can be no plain error if there was no error at all ***." *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010).

¶ 26    Turning to the substance of defendant's claim, it is well settled that a prosecutor is allowed a great deal of latitude in closing argument and has the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). The prosecutor may also respond to comments by defense counsel that clearly invite a response. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102. However, a prosecutor must refrain from making improper, prejudicial comments and arguments. *Hudson*, 157 Ill. 2d at 441. Even if a prosecutor's closing remarks are improper, they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different. *Id.* While it is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion, we need not resolve the matter, because our holding in this case would be the same under either standard. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 125. That is, viewing the remarks in the context of the entire closing argument, as we must, we conclude there was no reversible error committed here. See *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005).

¶ 27    Defendant specifically contends the prosecutor erroneously accused defendant of testifying falsely regarding which side of the bed his son fell from.[1]  There is some merit in this suggestion. During trial, defendant testified his son fell off the right side of the bed, even though the evidence technician had taken a photograph (which the State submitted into evidence) of the left side of the bed. During closing, the prosecutor asked rhetorically whether the evidence technician would have photographed the wrong side of the bed during the walkthrough with defendant, then asserted "defendant can't even keep what side of the bed [his son fell off of] straight." Contrary to the prosecutor's assertion, during posttrial motion proceedings, the parties stipulated that the evidence technician had in fact taken the photograph three days before the walkthrough. There was no evidence that defendant had lied in that regard. The trial court rejected defendant's posttrial argument that the State intentionally misled the jury, finding the prosecutor's comment was a reasonable inference at the time, that it was unintentional error, and that, regardless, the argument would not have swayed the jury one way or the other.

---

[1]Defendant contends he lodged a contemporaneous objection to this line of argument, and thus preserved the issue, but we disagree. The record reveals that defense counsel objected to the prosecutor's demonstration of how defendant would have had to reach over Joshua. This demonstration was not identified in the record. Defendant's assertion is belied by the record.

¶ 28    We note our disagreement with the trial court's suggestion in this regard, insofar as the argument was actually an unfair inference from the evidence. There was no testimony from the police or evidence technicians regarding how defendant described the scene when Joshua allegedly fell or regarding why the technician apparently chose only to photograph that particular side of the bed. Thus, the argument was based on an assumption and not the trial evidence. The posttrial proceedings later confirmed this.

¶ 29    Nonetheless, the prosecutor's comment, while improper, does not constitute reversible error for several reasons. First, rather than objecting, defendant waited and used the opportunity to respond to the prosecutor's misstatement in his own closing argument. One can easily conclude that this was a strategic choice on the part of defense counsel, because he masterfully wove it into his overall argument that the prosecution was inventing facts. See *People v. Beard*, 356 Ill. App. 3d 236, 244 (2005) (the decision of whether to object to closing argument is a matter of trial strategy). In this way, one could argue the misstatement by the State was a rhetorical gift to a defense lawyer who had a difficult case to argue. Counsel asserted to the jury that the "[S]tate's [A]ttorney mischaracterized half the testimony" and was "playing" on the jury's "sympathies." This was combined with defense counsel's argument that much of the State's case was "garbage," which could add only reasonable doubt in the jury's deliberations. This error did not result in substantial prejudice to defendant. Rather, defense counsel skillfully turned the remark to defendant's advantage, demonstrating the essence of good advocacy. Given defense counsel's response, and the court's instructions to the jury immediately before and after closing that arguments are not evidence, we find that any error was cured. See *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011). Second, the prosecutor's comment was made in passing and on an undeniably collateral matter. As the trial court noted, defendant testified at length, so the jury was able to evaluate his credibility. Whether the child fell off the right or left side of the bed is of no moment when defendant clearly and coherently testified that he was not even in the room when Joshua fell and that the injuries resulted from the bed fall and not from his intentional beating or shaking. Significantly, defendant's theory of the case was that the child could have hit the nightstand on his way to the floor. Since there were nightstands on either side of the bed, the State's inaccuracy could not have interrupted defendant's theory. In short, the State's improper comment did not destroy defendant's credibility before the jury or cause substantial prejudice to warrant reversal.

¶ 30    Furthermore, we find the evidence was anything but closely balanced. Several qualified witnesses testified for the State that the injuries Joshua sustained were a result of violent shaking or shaking combined with blunt trauma. These physicians actually treated the child before he died, and their expertise in dealing with this unfortunate sort of domestic trauma was well established. Defendant was the only individual at home with Joshua before these substantial injuries arose. One need not summon up a clever argument to describe the power of circumstantial evidence in such a tragic circumstance. Here, the medical evidence proffered by the State was more than compelling evidence of defendant's guilt. While defendant proposed an alternative theory via Dr. Plunkett's testimony, by any fair measure it would appear to have been insufficient in light of the State's competent evidence to the contrary. The State's evidence was substantial.

¶ 31    Defendant next contends the prosecutor impermissibly disparaged the defense expert Dr. Plunkett in rebuttal argument by referring to him as a "snake oil" salesman, a "hired gun"

who was being paid a salary to serve as a "professional witness," and repeatedly stating Dr. Plunkett was "making things up" with regard to his expert opinion. Defendant argues these comments "effectively charged defense counsel with fabricating a defense." The credibility of an expert witness is a proper subject for closing argument provided it is based on the evidence or inferences drawn from it. *Luna*, 2013 IL App (1st) 072253, ¶ 132. While it is not improper to call the defendant or a witness a "liar" if conflicts in the evidence provide for such an assertion, it is impermissible to assert defense counsel is engaging in trickery or misrepresentation. *People v. Starks*, 116 Ill. App. 3d 384, 394 (1983); see also *People v. Beltran*, 2011 IL App (2d) 090856, ¶ 69 ("It is not inappropriate to call the defendant a liar if the record supports that assertion.").

¶ 32     We do not condone the general tone or sarcasm adopted by the prosecution. It merits mention, however, that it was defense counsel who introduced the inflammatory term "hired gun" about which defendant now complains. *Cf. Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 30 (when, during argument at trial, plaintiff's lawyer referred to the retained medical expert for the defense as a " 'hired gun,' " no error occurred where the remark was grounded in evidence and the term was introduced by the witness himself). Notably, Dr. Plunkett had made his living solely as a testifying consultant for many years, primarily for the defense. The evidence suggests he was indeed a professional witness. The State honed in on this during its principal and rebuttal arguments as reason to disbelieve Dr. Plunkett due to bias. Thus, the prosecution's use of the term "hired gun" in a larger sense was grounded in the evidence and was not error. See *Luna*, 2013 IL App (1st) 072253, ¶ 133. We reach the same conclusion regarding the other comments suggesting that Dr. Plunkett was "making things up." The evidence showed that Dr. Plunkett admittedly represented a minority position in the medical community that short falls in children could cause the type of head and eye injuries which Joshua sustained, and Dr. Plunkett's position represented the direct opposite of the State's testifying experts. Unlike the State's witnesses, Dr. Plunkett was not a treating physician to children and had not treated Joshua. Moreover, the prosecution's rebuttal witness testified that Dr. Plunkett's 2001 study, while noteworthy, was more anecdotal in nature and not statistically significant so as to influence a doctor's clinical decision. Again, it is not necessarily improper to call an expert a liar or argue the invalidity of one expert's opinion (see *Starks*, 116 Ill. App. 3d at 394), and these comments were inferences arising from the evidence adduced at trial (see *Hudson*, 157 Ill. 2d at 441). Nonetheless, we wish to emphasize the undeniably caustic nature of these comments, especially the term "snake oil salesman," which were unnecessary to persuade the jury in this case. To the extent such comments flirted with impropriety or constituted error, however, they were insufficient to disturb the jury verdict because they did not cause substantial prejudice to defendant. *Hudson*, 157 Ill. 2d at 441. The jury would have reached the same conclusion in the absence of the comments. Likewise, any error or impropriety was cured by the court's proper jury instructions, which carry more weight than attorney argument, and also the court's admonition that arguments are not evidence. See *Willis*, 409 Ill. App. 3d at 814.

¶ 33     We likewise reject defendant's argument that the prosecution improperly impugned his character during closing. The prosecutor noted that defendant disappeared from Joshua's life several weeks after the child was born, missed Joshua's first Christmas, and only reappeared some months later. The prosecutor noted that defendant was married to another woman the entire time, so he was not exactly "father of the year." These facts were in evidence and related

to defendant's interest in caring for his child and thus his credibility. Again, even if they constituted error, the error would not approach a level warranting reversal. Based on the foregoing, the alleged errors do not constitute plain and reversible error. Defendant has failed to show the cumulative effect of these errors warrants reversal. See *Coulter*, 230 Ill. App. 3d at 230.

¶ 34 Defendant lastly contends he is entitled to 48 additional days of presentence custody credit because he was arrested on January 13, 2008, and sentenced on March 23, 2012. See 730 ILCS 5/5-4.5-100(b) (West 2012); *People v. Williams*, 239 Ill. 2d 503, 509 (2011). The State notes the arrest report indicates defendant was arrested January 31, 2008. Defendant counters that both the mittimus and indictment return sheet list his arrest date as January 13, 2008, and Cook County records, of which we may take judicial notice (see *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010)), indicate his bail was set three days later. In light of the discrepancy, we credit defendant with the earlier date of January 13, 2008. He is entitled to 48 days of presentence custody credit, excluding the day the mittimus issued, for a total of 1,531 days. We direct the clerk of the circuit court to correct the mittimus accordingly. *People v. Rivera*, 378 Ill. App. 3d 896, 900 (2008).

¶ 35 Defendant also asserts he is entitled to certain fines, fees, and costs, including $100 for the methamphetamine law enforcement fund, $25 for the drug traffic prevention fund, $5 for the court system (violation of the Illinois Vehicle Code), $5 for electronic citation, $10 for the mental health court, $5 youth diversion/peer court, $5 for the drug court, and $30 for the children's advocacy center. The State concedes these fines and fees were charged in error. The State also concedes that the latter four charges may be offset by the $5-per-diem credit for time spent in pretrial custody. See 725 ILCS 5/110-14 (West 2012); *People v. Jones*, 397 Ill. App. 3d 651, 663 (2009) (the credit applies only against a "fine," not a fee); see also *People v. Paige*, 378 Ill. App. 3d 95, 102 (2007) (mental health court and the youth diversion/peer charges are characterized as fines). Defendant's fines, fees, and costs are adjusted to reflect a total assessment of $850. We direct the clerk of the circuit court to correct the mittimus and fines and fees order accordingly. *Rivera*, 378 Ill. App. 3d at 900.

¶ 36                                                    CONCLUSION

¶ 37 Based on the foregoing, we affirm the judgment of the circuit court of Cook County.

¶ 38 Affirmed; mittimus corrected; fines and fees order corrected.