# Illinois Official Reports

## Appellate Court

---

### *People v. Anaya*, 2017 IL App (1st) 150074

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ADALBERTO ANAYA, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-0074 |
| Filed | December 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-806201; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Gregg L. Smith, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Christine Cook, and Margaret A. Hayes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1        After a jury trial, defendant Adalberto Anaya was convicted of nine counts of aggravated criminal sexual assault and sentenced to 100 years with the Illinois Department of Corrections (IDOC). On this appeal, defendant claims that he was denied a fair trial by (1) the State's suggestion, during its questioning of defendant during cross-examination, that defendant had the burden to produce his phone records and (2) the State's allegedly prejudicial closing argument, during which the prosecutor (a) referred to the lack of phone records, (b) asked the jury to put themselves in the victim's shoes, and (c) argued that "everyone" in the courtroom "knows" the victim was raped. Defendant also claims that the trial court abused its discretion by sentencing him to a total of 100 years in prison with IDOC by failing to adequately consider factors in mitigation, including defendant's lack of prior criminal history involving sex crimes, the hardship to his family, and his potential for rehabilitation.

¶ 2        For the following reasons, we affirm.

¶ 3                                                        BACKGROUND

¶ 4        The police arrested defendant on April 4, 2012, after his DNA matched the male DNA profile found in the victim's vagina.

¶ 5                                                I. Pretrial Proceedings

¶ 6        On May 14, 2012, defendant, age 32, was charged with 18 counts of aggravated criminal sexual assault and three counts of criminal sexual assault. Ultimately, the State proceeded to a jury trial on nine counts of aggravated criminal sexual assault. The parties stipulated that the statute of limitation was extended pursuant to section 3-5(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/3-5(a)(2) (West 2004))[1] for the nine counts of aggravated criminal sexual assault because (1) the victim reported the offense to law enforcement authorities within two years of the date of its commission and (2) defendant's DNA profile was entered into a DNA database within 10 years of the date of the commission of the offense.[2] The trial court granted the State's motion to introduce defendant's prior conviction for aggravated battery for impeachment purposes because defendant planned to offer testimony challenging the victim's version of events. The trial court indicated that it would give a limiting instruction "on how they can consider it *** for credibility and no other purpose."

¶ 7                                        II. The State's Evidence at Trial

¶ 8        The victim, age 30, testified that on February 12, 2007, at 6 a.m., she was walking to work when a masked man pressed a sharp object against her side and forced her into an alley near

---

[1]The parties stipulated to the 2004 version of the Code instead of a more recent version of the Code. Also, the stipulation does not mention subsection "(a)," but this appears to be a simple typo and we have included it for clarity.

[2]If the offense involves "sexual conduct," and "the DNA profile of the offender is obtained and entered into a DNA database within 10 years after the commission of the offense," and "the identity of the offender is unknown after a diligent investigation by law enforcement authorities," and the victim reported the offense within 2 years after the commission of the offense, then the prosecution may be commenced at any time. 720 ILCS 5/3-5(a)(2) (West 2004).

North Parkside Avenue in Chicago (Location 1), where he sexually assaulted her vaginally, anally, and orally. He also put his mouth on her breast. After he told her to dress, the victim attempted to flee but the offender grabbed her and led her to an area across the street (Location 2) and sexually assaulted her vaginally and orally a second time. At both locations, the offender wore a ski mask, so she never observed his face. After the assaults ended, he ordered the victim to face the wall and count to 50 while he stole her keys, watch, and some coins from her backpack and then fled. After realizing she was alone, the victim traveled to her workplace, where her manager contacted the Chicago police.

¶ 9    The victim's manager testified that he was at work at 6:30 a.m. on February 12, 2007, when the victim arrived at work and told him that she had been raped. He tried to calm her down and then he called the police.

¶ 10    Chicago Police Officer Monica Reyes testified that on February 12, 2007, she responded to the manager's call and arrived at the victim's workplace. Other responding officers arrived a few minutes later. Officer Reyes spoke with the victim and received the following description of the offender: "a male Hispanic, approximately 5'8", thin build, black shirt, pants, with a mask." A fire department ambulance transported the victim to a hospital emergency room at 7:15 a.m.

¶ 11    Kelly Sanabria, the attending nurse at the hospital, testified that she interviewed the victim, who told her that the offender ejaculated inside the victim's body. The nurse performed a Vitullo kit (rape kit) on the victim to collect DNA and other evidence of the offender's identity. Specifically, she swabbed the areas where the offender penetrated and touched the victim. The nurse marked and sealed the rape kit in envelopes and turned them over to the custody of Chicago Police Officer Willard Streff at 10:20 a.m.

¶ 12    Officer Streff testified that he transported the kit to a police station, where he inventoried it and stored it in a secure office within the station.

¶ 13    Dr. Edward Bunney, an emergency room physician, testified that he conducted a physical and gynecological exam and observed that there was grass and debris in the opening to the victim's vagina and a thin white discharge in the anal area. He testified that semen can be present in the anal area even if there is only vaginal intercourse. He also observed "erythema" around the victim's anal area, which he explained was an irritation to the skin generally caused by rubbing. He did not find any lacerations, scratches, or bruises on the victim's body, but also noted that it is not uncommon for someone who has been sexually assaulted to have no injuries or genital trauma.

¶ 14    Andrea Paulsen and Kelly Biggs, forensic scientists for the Illinois State Police Forensic Science Services, testified as experts in the field of forensic biology and DNA. Paulsen tested the vaginal, anal, oral, and breast swabs taken from the victim for semen. Paulsen testified that semen was indicated on the vaginal and anal swabs. Paulsen also tested the breast swab for the presence of saliva and found that saliva was indicated on the breast swab. Paulsen then preserved the swabs for future DNA analysis.

¶ 15    Biggs testified that she conducted DNA analysis of the vaginal swabs collected from the victim and determined the presence of a male DNA profile from the semen portion. She entered the male DNA profile from the vaginal swab into a state database on June 8, 2007. At that time, the DNA profile did not match any of the database's profiles. On cross-examination, she further testified that semen tends to stay in the vaginal vault for up to approximately 72 hours and that the male DNA profile could have come from a consensual partner that had been

deposited before the assault. She testified that there is a possibility that the DNA of the offender may not be present if he wore a condom.

¶ 16 The parties stipulated that, if called to testify, Investigator Walsh[3] would testify that, on September 4, 2012, he was employed with the Cook County State's Attorney's Office as an investigator. On that day, he was assigned to collect a buccal swab standard from defendant's mouth and followed proper protocol in collecting, packaging, and sealing the buccal swab standard from defendant's mouth.

¶ 17 Lynette Wilson, a forensic scientist with the Illinois State Police, testified as an expert in the field of forensic DNA analysis. Wilson compared the male DNA profile from the vaginal swabs to defendant's DNA profile and concluded that the profiles "matched." She calculated that the male DNA profile was consistent with defendant's profile.[4]

¶ 18 Detective Susan Barrett testified that she was first assigned to this case on the date of the assault in 2007 and did not have any leads until March 2012, when the database linked the male DNA profile from the victim's vaginal swabs to defendant's DNA profile. Once Detective Barrett identified defendant as a potential suspect, she contacted the victim and showed her a photo of defendant. The victim told her that she did not know the man in the photograph and that she had never had sexual relations with him. On April 4, 2012, Detective Barrett located and placed defendant under arrest and then transported him to a police station. She testified that defendant's physical appearance matched the description given by the victim to the original officer seven years earlier. Detective Barrett testified that, after defendant received his *Miranda* warnings and waived his privilege against self-incrimination and right to counsel, he agreed to speak with her. Defendant told her that he did not recall his whereabouts at the time of the rape but he denied ever sexually assaulting anyone. He stated that he had been with his wife since they were 16 years old, that he does not cheat on his wife, and that he never had sex with anyone but his wife. Detective Barrett testified that she then told defendant that defendant's DNA was found inside of an alleged rape victim. In response, defendant repeated that he had never had sex with anyone but his wife, and therefore he did not understand how this was possible. Detective Barrett then stated the victim's name and asked if defendant knew her. Defendant stated that he did not.

¶ 19                            III. Defendant's Testimony

¶ 20 After the State rested its case-in-chief and the trial court denied the defense's motion for a directed verdict, defendant testified that he recognized the victim from 2007 and that she called herself "Gloria." Defendant and the victim met on February 1, 2007, and exchanged telephone numbers after a conversation. A week and a half after their first encounter, they went on a date at a restaurant and spoke numerous times on the phone. On February 11, 2007, he met the victim between 10:45 p.m. and 11 p.m. at a restaurant, and they started walking through a small park at "about 11:05 p.m." After a long conversation, during the morning of February 12, 2007, they began kissing which led to intercourse. He testified that it was consensual vaginal intercourse and that he was not wearing a condom. Afterward, he told her he was married, at which point she became upset and told him that she did not want to be with a married man

---

[3]Walsh's first name does not appear in the record.

[4]Wilson also testified that there was a partial male DNA profile found on the breast swab, and defendant could not be excluded as being a possible contributor to that male DNA profile.

before walking away. He denied any involvement in the rape incident that the victim testified began at 6 a.m. later that same day. Defendant also explained that Detective Barrett had asked only if he knew the victim by her legal name and did not provide a picture. Since defendant knew her as "Gloria," he was truthful in his response. However, defendant admitted to lying to Detective Barrett about never cheating on his wife.

¶ 21     On cross-examination, the State asked about the phone conversations between defendant and the victim in 2007, and specifically what his phone number was:

> "ASSISTANT STATE'S ATTORNEY (ASA): What was your phone number back then?
> DEFENDANT: I don't remember.
> ASA: You don't remember what your phone number was?
> DEFENDANT: No. I went through so many phones."

¶ 22     Defendant then recounted how he and Gloria met and how he offered to give her his phone number to call him any time she wanted. Defendant testified that she took him up on his offer, and they had nine conversations on the telephone. The State then asked about defendant's phone carrier:

> "ASA: Who was your phone carrier back then?
> DEFENDANT: US Cellular.
> ASA: US Cellular?
> DEFENDANT: Yeah.
> ASA: They would have a record of the phone calls?
> DEFENDANT: I believe so.
> ASA: Do you have any phone records with you today sir?
> DEFENSE COUNSEL: Objection.
> THE COURT: Overruled.
> DEFENDANT: No, I don't, because it was prepaid."

¶ 23                                   IV. Closing Arguments

¶ 24     In this appeal, defendant makes claims about certain remarks made by the prosecutor during the State's closing argument, so we quote those remarks here.

¶ 25                          A. Defense Counsel's Closing Argument

¶ 26     In defendant's closing argument, counsel began by stating that:

> "[T]here is no question [the victim] was raped on February 12, 2007. And there is no question that at some time during the three days prior, [defendant] had vaginal sex with [the victim]. And there is no question and there is no doubt and there is no easy way around the fact that [the victim] is a singularly unreliable witness."

¶ 27     The defense then sought to cast doubt on the use of force stating:

> "[W]ithin the vagina, within the anus where [Dr. Bunney] looked, there was no tearing, no bruises, no scratches, no lacerations on [the victim's] entire body, ladies and gentlemen. Remember [the victim] had to get naked to go through this examination.

There were no bruises, no scratches, none, no lacerations, no bites, no burns, no fractures, nothing."

¶ 28 Defense counsel concluded by attempting to bolster defendant's credibility, while simultaneously attempting to undermine the credibility of the victim. First, defense counsel—summarizing what defendant had testified to—stated: "He said to you I knew her as Gloria. I had met her. We had talked for a week. We had sex in the park." Regarding this portion of defendant's testimony, defense counsel commented, "[n]o one is arguing about that."

¶ 29 Defense counsel further attacked the credibility of the victim's testimony by commenting that:

"[The victim] told the State she can't remember if [the attacker] wore a condom. Well, we know why that is important. Because if [the attacker] did, he very well may not have left any DNA behind. Thus, the DNA that matches my client confirms his story, not hers."

¶ 30                          B. The State's Closing Argument

¶ 31 During its rebuttal argument, the State argued:

"Ladies and gentlemen, [the victim] was paralyzed with fear. She didn't resist at all because she thought she was going to die. She made the decision that she would let her rapist have his way with her to save her life. God forbid anyone in this room ever [has] to make that decision."

¶ 32 The defense objected, and the trial court instructed the jury to "disregard that last statement about anyone in this room." Moments later, the State told the jury "she was raped, and everyone in this room knows it." The defense did not object.

¶ 33 In making its final points of rebuttal, the State posed the following question to the jury: "Why does [defendant] tell you he doesn't remember his phone number? Because he knows I would ask for phone records." The defense objected but was overruled by the trial court.

¶ 34                                    V. Conviction

¶ 35 The jury found defendant guilty of all nine counts of aggravated criminal sexual assault.

¶ 36 Defendant filed a posttrial motion for a new trial, claiming that the State:

"made prejudicial inflammatory and erroneous statements in closing arguments designed to arouse the prejudices and passions of the jury, thereby prejudicing the defendant's right to a fair trial."

In a supplemental motion for a new trial, defendant claimed that:

"The Court erred in overruling Defense objections to the State's leading and prejudicial questions during both direct, redirect and cross examination of witnesses."

¶ 37 At the hearing on the motions, the State argued that the motions failed to "allege specificity as to what exactly it was that allegedly [the State] said that was inflammatory or erroneous." Defense counsel responded to the State's argument in the following exchange with the trial court:

"DEFENSE COUNSEL: I think that my motion and [co-counsel's] motion are detailed enough, and the court does have the option of reviewing the transcript.

THE COURT: Well, if you got the transcript already.

DEFENSE COUNSEL: I'm more than happy to tender the transcript to the Court.

THE COURT: Why didn't you support that transcript in your Motion for a new trial then? Do you recall this, do you recall that?

DEFENSE COUNSEL: Judge, I know that the State referred to my client as a rapist. That's the detail that I'm giving to the Court.

THE COURT: Okay.

DEFENSE COUNSEL: I think that the Court might recall that the objection to that being stated, I believe, that my and [co-counsel's] motion pass muster and are specific enough."

¶ 38 The trial court responded, in part, by stating: "I don't know which one you are referring to in particular." The trial court denied defendant's motions for a new trial.

¶ 39 VI. Sentencing

¶ 40 At sentencing, the trial court considered both factors in aggravation and mitigation, including the victim's impact statement in which she stated how the sexual assault affected her psychologically and physically and continues to do so today, as well as defendant's criminal history. His criminal history included a felony conviction for aggravated battery to a police officer and four misdemeanors: (1) misdemeanor domestic battery in 2001 with supervision terminated unsatisfactorily, (2) misdemeanor battery in 2007 with six months' probation, which he violated, (3) driving under the influence in 2008, and (4) obstruction in 2010, which included an active warrant and the case being left unresolved. The mitigating factors included his close relationships to his family and lack of criminal sexual history. The trial court sentenced defendant to 100 years with IDOC. The trial court denied defendant's motion to reconsider his sentence, and this appeal followed.

¶ 41 ANALYSIS

¶ 42 On this appeal, defendant claims that he was denied a fair trial by (1) the State's questions during defendant's cross-examination and the State's comments during closing argument that suggested that defendant bore the burden to produce his phone records, (2) the State's remark during closing argument asking the jury to put themselves in the victim's shoes, and (3) the State's comment during closing argument that "everyone" in the courtroom "knows" the victim was raped. Defendant also claims that the trial court abused its discretion by sentencing him to a total of 100 years in prison with IDOC because the court failed to adequately consider factors in mitigation, including defendant's lack of prior criminal history involving sex crimes, the hardship to his family, and his potential for rehabilitation. For the following reasons, we affirm.

¶ 43 I. Standard of Review

¶ 44 It is not clear whether the appropriate standard of review for closing arguments is *de novo* or abuse of discretion. We have previously made this same observation in several cases, including *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 54 ("The standard of review for closing arguments is currently unclear."), *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26, *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 149-51, and *People v. Phillips*, 392 Ill. App. 3d

- 7 -

243, 274-75 (2009). The Second District Appellate Court has agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26; *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 45 Our supreme court has found that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). However, the supreme court in *Wheeler* cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), in which the supreme court had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had found that the substance and style of closing argument is within the trial court's discretion and a judgment will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court reasoned that "[b]ecause the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 46 Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26 (noting that the issue remains divided). The First and Third Divisions of the First District have applied an abuse of discretion standard, while the Third and Fourth Districts and the Fifth Division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 313 (2007), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (2008), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (2008), and *People v. Ramos*, 396 Ill. App. 3d 869, 874 (2009). However, we do not need to resolve the issue of the appropriate standard of review at this time because our holding in this case would be the same under either standard. *E.g.*, *Sandifer*, 2016 IL App (1st) 133397, ¶ 55 (declining to choose a standard of review and finding that it "need not resolve the appropriate standard of review because" under either standard the "holding is identical").

¶ 47                                II. Phone Records

¶ 48 In the instant case, defendant first claims that the State improperly shifted the burden of production onto defendant when it made comments about defendant's missing phone records during cross-examination and again during closing statements. During cross-examination, defendant was asked if he had phone records with him that day and, over defense counsel's objection, he answered "no I don't, because it was prepaid." During closing statements, the State referenced defendant's answer in its rebuttal: "[W]hy does [defendant] tell you he doesn't remember his phone number? Because he knows I would ask for phone records." Defendant argues on appeal that these statements were burden shifting and misled the jury because defendant had no obligation to produce phone records to prove his innocence.

¶ 49                                            A. Forfeiture

¶ 50        A " 'defendant must both specifically object at trial and raise the *specific* issue again in a posttrial motion to preserve an alleged error for review.' " (Emphasis added.) *People v. Johnson*, 385 Ill. App. 3d 585, 595-96 (2008) (quoting *People v. Woods*, 214 Ill. 2d 455, 470 (2005)); see also *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). A "[d]efendant's failure to object at trial rob[s] the trial court of the opportunity to correct the error, and his failure to object in a posttrial motion deprive[s] this court of the factual findings that the trial court might have made" concerning the credibility of witnesses, the effect of the alleged error on the weight of the evidence against defendant, and, thus, the possible impact of the error. *People v. Davis*, 378 Ill. App. 3d 1, 10-11 (2007).

¶ 51        In the instant case, defense counsel objected to the State's question about phone records during cross-examination and the State's reference to the phone records during its closing statements. However, defendant failed to raise the objection in either his motion for a new trial or his supplemental motion for a new trial.

¶ 52        Defendant's original motion for a new trial claimed that "[t]he Assistant State's Attorney made prejudicial inflammatory and erroneous statements in closing arguments designed to arouse the prejudices and passions of the jury, thereby prejudicing the defendant's right to a fair trial." In *People v. Sutton*, 316 Ill. App. 3d 874 (2000), this court found that almost this same exact statement was not specific enough. In *Sutton*, we found that the defendant's motion for a new trial which stated that " '[t]he assistant [S]tate's [A]ttorney made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury thereby prejudicing the defendant's right to a fair trial,' *was too general* to have alerted the court to the proposed error that defendant now argues on appeal." (Emphasis added.) *Sutton*, 316 Ill. App. 3d at 893-94. Similarly, in the case at bar, defendant's motion, which used the almost exact same statement, was too general to have alerted the trial court to the proposed error.

¶ 53        The transcript of the hearing on the posttrial motions further shows defendant's lack of specificity. In his supplemental motion for a new trial, defendant claimed that "the [trial] Court erred in overruling [d]efense objections to the State's leading and prejudicial questions during both direct, redirect and cross examination of witnesses." At the hearing, the trial court told defense counsel that it did not know which objections defense counsel was referring to and asked why his motions did not reference the trial transcript that the defense had in its possession. *Supra* ¶¶ 37-38. Defense counsel responded to the trial court: "I know the State referred to my client as a rapist. That's the detail I'm giving to the Court." Counsel insisted to the trial court that the motions were "specific enough."

¶ 54        However, the claim of error defendant specified at the hearing—that "the State referred to my client as a rapist"—is different from defendant's present claim about phone records.

¶ 55        Defendant did not raise the phone records issue in his posttrial motions. Failure to either object to the error at trial or raise the error in a posttrial motion results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48; *People v. Belknap*, 2014 IL 117094, ¶ 66 (in order to preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion). Thus, defendant forfeited the error for our review.

¶ 56                                B. Plain-Error Doctrine

¶ 57          When a defendant has failed to preserve an error for review, we may still review the issue for plain error. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 564; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.").

¶ 58          The plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. In a plain-error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶¶ 51-52; see also *Woods*, 214 Ill. 2d at 471. However, "[t]he initial analytical step under either prong of the plain error doctrine is [to] determin[e] whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 59          Defendant does not expressly state whether he is arguing this claim under the first or second prong of the plain-error doctrine. He appears to be arguing under the first prong because he makes claims about "the sufficiency of the evidence" and contends that the alleged errors "tipped the scales of justice" against him. However, whether he is arguing under the first or second prong is not material to our analysis because he must first show, under either prong, a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565. As discussed below, we find that he did not satisfy this initial burden.


¶ 60                                C. Clear or Obvious Error

¶ 61          Defendant claims that the State impermissibly attempted to shift the burden of proof onto defendant during cross-examination and closing argument, and that the trial court erred when it overruled defendant's objections during both cross-examination and closing argument.

¶ 62          A reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 122-23; *People v. Johnson*, 208 Ill. 2d 53, 113 (2003); *Tolliver*, 347 Ill. App. 3d at 224. A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. Arguments and statements that are based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of closing argument. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 158 (citing *People v. Crawford*, 343 Ill. App. 3d 1050, 1058-59 (2003)). As is the case with closing argument, a prosecutor is also allowed a great deal of latitude during cross-examination. *People v. Robinson*, 199 Ill. App. 3d 24, 35 (1989). It is well established that the latitude to be allowed on cross-examination is a matter within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision unless there is a clear abuse of that discretion. *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 56; *Robinson*, 199 Ill. App. 3d at 34.

¶ 63          We do not agree that the State impermissibly attempted to shift the burden of proof onto the defense during cross-examination and closing argument. The fact that defendant did not remember his phone number was a fact that the jury could consider and draw reasonable inferences from. Had defendant remembered his phone number, the State could have

- 10 -

attempted to obtain his phone records. If defendant had remembered his phone number, defendant would have had a stronger argument that the State was trying to shift the burden of proof onto defendant. But we do not have that here. Defendant did not remember it, thereby making it difficult for the State or anyone to seek defendant's phone records. The State could not shift a burden to produce records if production was close to impossible for anyone, in light of defendant's inability to remember the number and his use of prepaid cards. Both of these facts were facts that the jury could consider and draw reasonable inferences from. We find no clear or obvious error in the State's comments or the trial court's subsequent overruling of the defense's objections.

¶ 64                             III. In the Victim's Shoes

¶ 65    Defendant's next claim is that the prosecutor's comments "plainly invited the jury to put themselves in the shoes of the victim" when she stated, "God forbid anyone in this room ever [has] to make that decision." As above, we must first determine if this claim is forfeited.

¶ 66                                A. Forfeiture

¶ 67    When this statement was made, the defendant objected to it, and the trial court instructed the jury to "disregard that last statement about anyone in this room." However, as we explain below, defendant failed to " 'raise the *specific* issue again in a posttrial motion to preserve an alleged error for review.' " (Emphasis added.) *Johnson*, 385 Ill. App. 3d at 595-96 (quoting *Woods*, 214 Ill. 2d at 470).

¶ 68    During the hearing on the posttrial motion, the following exchange between defense counsel and the judge occurred:

> "DEFENSE COUNSEL: I felt that even if this Court were to tell a jury to disregard a statement the jury still hears that statement, and Ms. Fritz [first defense counsel for defendant] did object—
>
> THE COURT: What are you talking about? Give me an example of what you're talking about.
>
> DEFENSE COUNSEL: Judge, I don't have an example in front of me. I can just tell the Court that from reading the transcripts there were numerous objections made by Ms. Fritz and her co-counsel regarding inflammatory and erroneous statements in the closing argument, many of which were overruled, but we would argue that those rulings by the Court were erroneous in themselves, and those statements were inflammatory to the jury.
>
> THE COURT: Without knowing what they were how can I—
>
> DEFENSE COUNSEL: Well, I believe they refer to my client as a rapist, Judge."

¶ 69    The trial court's next question was, "What else do you wish to argue?" To which defense counsel responded, "I'll rely on—I'll rest on the four corners of the motion, Judge."

¶ 70    Defendant's posttrial motion failed to identify the specific comment and, when asked by the trial court to provide more specificity, counsel referred to a different statement. Counsel stated: "Well, I believe they refer to my client as a rapist, Judge." However, the comment he objected to here was where the State asked the jurors to empathize with the victim and place themselves in her shoes. Defense counsel did not mention this comment to the trial court when the court asked: "What are you talking about?" Therefore, this claim is forfeited for our review.

¶ 71                                    B. Plain-Error Doctrine

¶ 72        We already set forth the plain-error doctrine (*supra* ¶¶ 57-59), and we will not repeat it here. Defendant does not specify whether this error constitutes plain error under the first or second prong of the plain-error doctrine. Our first step, however, is to determine if there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. For the following reasons, we find that the comment complained of here, "God forbid anyone in this room ever [has] to make that decision," does not rise to the level of clear or obvious error.

¶ 73                                   C. Clear or Obvious Error

¶ 74        In *People v. Spreitzer*, 123 Ill. 2d 1 (1988), the defendant was appealing a murder, kidnapping, and a death sentence. In *Spreitzer*, the prosecution stated:

>      " 'Think of it. You, any of us walking down a street, being grabbed by one, two or three individuals like this man, who have one intent, to kill somebody, to kill you. ***

>      Please attempt to place yourselves in the shoes of Linda Sutton, in the shoes of Lori Borowski, in the shoes of Sandra Delaware, in the shoes of Rose Beck Davis, in the shoes of Shui Mak, in the shoes of Rafael Tirado, in the shoes of Beverly Washington, and into the shoes of these other two unknown victims that we still haven't found.

>      Place yourself in their shoes and think what they must have been thinking about at the time they were murdered. ***

>      Place yourself in the shoes of these individuals at the time this started occurring to them.

>      What went through their minds when they were shot, stabbed, mutilated, handcuffed.' " *Spreitzer*, 123 Ill. 2d at 37-38.

¶ 75        In *Spreitzer*, the Illinois Supreme Court found these statements "highly improper." *Spreitzer*, 123 Ill. 2d at 38. The court explained that the "State was not free *** to invite the jurors to enter into some sort of empathetic identification with the victims." *Spreitzer*, 123 Ill. 2d at 38. However, *Spreitzer* is distinguishable from the case at bar.

¶ 76        Here, the State's lone comment was "brief and isolated in the context of lengthy closing arguments, [which is] a factor we have found significant in assessing the impact of such remarks on a jury verdict." *People v. Runge*, 234 Ill. 2d 68, 142 (2009); see *People v. Harris*, 225 Ill. 2d 1, 33 (2007). Moreover, defense counsel's objection was sustained, and the jury was subsequently instructed that it should disregard the comment. This consideration is also a factor in our analysis. *Runge*, 234 Ill. 2d at 143; see *People v. Bannister*, 232 Ill. 2d 52, 91 (2008) ("any improper inferences from the prosecutor's comments were cured by the trial court sustaining defense counsel's objections and the court's instructions to the jury to disregard comments to which objections were sustained"); *Harris*, 225 Ill. 2d at 33 (in considering the possibility of prejudice, the court noted that "defense counsel's objection to the comments was sustained and the jury was properly instructed that the arguments of counsel were not evidence that it could consider").

¶ 77        Examining the State's entire closing argument, we do not find that the State made repeated attempts to lure the jury to enter into an empathetic identification with the victim. We find, instead, an "isolated remark," which did not constitute "a major theme in the State's argument." *People v. Cloutier*, 178 Ill. 2d 141, 168 (1997); see also *People v. Hall*, 195 Ill. 2d 1, 26 (2000). In addition, " 'a ruling sustaining a defense objection generally is sufficient to

cure any prejudice that may have occurred.' " *Burgess*, 2015 IL App (1st) 130657, ¶ 206 (quoting *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006)). Thus, we find no clear or obvious error in the State's brief, isolated, and judicially sustained and corrected remark.

¶ 78                                 IV. Everyone Knows It

¶ 79      Defendant's third claim is that the prosecutor's comment, "she was raped, and everyone in this room knows it," was improper. Defendant argues that this "comment[ ] [was] grossly prejudicial and could have persuaded jurors who were on the fence to deliver a guilty verdict especially since, according to the prosecution, even the judge knew that Anaya was guilty." As above, we must first determine if this claim was forfeited.

¶ 80                                    A. Forfeiture

¶ 81      First, defendant's argument at the hearing on the posttrial motion, while ambiguous, could be construed as an attempt to specifically raise this issue for appeal. The objected-to comment was "she was raped" and, at the hearing, counsel argued that the State called his client "a rapist." However, defendant failed to make a contemporaneous objection at trial, even though the judge had just sustained a previous objection by the defense. This alone forfeits the claim. *Johnson*, 385 Ill. App. 3d at 595-96 (" 'defendant must both specifically object at trial *and* raise the specific issue again in a posttrial motion to preserve an alleged error for review' " (emphasis added) (quoting *Woods*, 214 Ill. 2d at 470)).

¶ 82                                    B. Plain Error

¶ 83      Defendant, again, does not specify whether this comment constitutes error under the first or second prong of the plain-error doctrine. Our first step, however, is to determine if there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. For the following reasons, we find that the comment complained of here, "she was raped, and everyone in this room knows it," does not constitute clear or obvious error.

¶ 84                              C. Clear or Obvious Error

¶ 85      In reviewing allegations of prosecutorial misconduct during closing argument, the remarks must be considered in light of the entire arguments of both the prosecution and the defense. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102; *Wheeler*, 226 Ill. 2d at 122. Also, a prosecutor may respond to comments made by defense counsel that invite a response. *Willis*, 2013 IL App (1st) 110233, ¶ 102; *Hudson*, 157 Ill. 2d at 441. Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009); see also *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000).

¶ 86      We do not find clear or obvious error in the State's comment. The prosecutor's comment was in response to a comment made by defense counsel that "invite[d] a response." *Willis*, 2013 IL App (1st) 110233, ¶ 102. Defense counsel, at the beginning of the defense's closing argument, stated, "[l]adies and gentlemen, there is no question [the victim] was raped on February 12, 2007." A prosecutor—seeking to prove rape—can, within the " 'wide latitude' " afforded to a prosecutor during closing argument, reiterate such a comment. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 84 (quoting *Wheeler*, 226 Ill. 2d at 123). It is "well settled that a prosecutor is allowed a great deal of latitude in closing argument and has the right to comment

upon the evidence presented and upon reasonable inferences arising therefrom, *even if such inferences are unfavorable to the defendant*." (Emphasis added.) *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26; *Willis*, 2013 IL App (1st) 110233, ¶ 101 (noting "[d]uring closing arguments, the prosecutor may comment on the evidence and any 'fair, reasonable inferences' from it, even if those inferences reflect negatively on the defendant" (quoting *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005))). A prosecutor is certainly permitted to repeat an observation already made by the defense in the defense's own closing argument. Thus, we find that this comment did not constitute clear or obvious error, and was not error at all.

¶ 87    In sum, we do not find that any of the three trial errors alleged by defendant constitute clear or obvious error.

¶ 88                            V. Second-Prong Analysis

¶ 89    Even if we were to find a clear or obvious error, we still could not find plain error under either prong of the plain-error doctrine. Under the second prong of the plain-error doctrine, we may review unpreserved issues when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; see *People v. Getter*, 2015 IL App (1st) 121307, ¶ 57; *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 90    In *People v. Clark*, 2016 IL 118845, our supreme court observed that, "although our decisions" in a couple of prior cases "equated second-prong plain error with structural error, we did not restrict plain error to the types of structural error that have been recognized by the [United States] Supreme Court." *Clark*, 2016 IL 118845, ¶ 46 (discussing *Glasper*, 234 Ill. 2d 173, and *Thompson*, 238 Ill. 2d 598). Thus, our second-prong error certainly includes the six categories identified by the United States Supreme Court but it is not limited to them. The six identified categories of second-prong error are (1) a complete denial of counsel, (2) a biased trial judge, (3) racial discrimination in the selection of the grand jury, (4) a denial of self-representation at trial, (5) a denial of a public trial, and (6) a defective reasonable-doubt instruction. *People v. Johnson*, 2015 IL App (1st) 141216, ¶ 46.

¶ 91    However, in this appeal, defendant does not expressly ask us to consider the issues under the second prong of the plain-error doctrine. Additionally, the language of defendant's brief does not suggest or imply an argument for a finding of error under the second prong either. As such, without any argument for a finding of plain error under the second prong, without an argument for a finding of a new category under the second prong, and with the defense's case not falling into one of the six delineated categories, we find no plain error under the second prong.

¶ 92                            VI. First-Prong Analysis

¶ 93    Defendant asks us, implicitly, to consider whether any of his claims rose to the level of plain error under the first prong of the plain-error doctrine. Even if we were to find a clear or obvious error, we still could not find plain error under the first prong of the plain-error doctrine.

¶ 94    Under the first prong of the plain error doctrine, we will reverse a conviction when a clear or obvious error occurred and the evidence is so closely balanced that the error alone

threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Piatkowski*, 225 Ill. 2d at 565. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *Piatkowski*, 225 Ill. 2d at 566. Thus, evidence may be sufficient but still closely balanced. *Piatkowski*, 225 Ill. 2d at 567 (our supreme court proceeded to consider whether the evidence was closely balanced, after first determining that it was sufficient); see *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 129.

¶ 95   "The relevant inquiry" for sufficiency purposes is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Piatkowski*, 225 Ill. 2d at 566. By contrast, the relevant inquiry under the first prong is whether *defendant* met his burden to "show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Piatkowski*, 225 Ill. 2d at 566 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). "When error occurs in a close case, we will opt to 'err on the side of fairness, so as not to convict an innocent person.' " *Piatkowski*, 225 Ill. 2d at 566 (quoting *Herron*, 215 Ill. 2d at 193); see *McCoy*, 2016 IL App (1st) 130988, ¶¶ 129-30.

¶ 96   We do not find that the defendant has met his burden to show that the quantum of evidence presented by the State against him rendered the evidence closely balanced.

¶ 97   First, the issue here turns on a credibility determination concerning consent, and this court owes great deference to a jury's credibility determinations. *Johnson*, 385 Ill. App. 3d at 593; *People v. Griggs*, 152 Ill. 2d 1, 29 (1992). The credibility of the defendant was undermined by the fact that no one corroborated his version of events, while his testimony corroborated a large portion of the victim's testimony. Defendant argued that the victim's sex with him that evening was consensual and that it was possible that, after consensual sex with him, a masked rapist came along and forcibly raped the victim with a condom on—thus leaving only the defendant's DNA inside the victim to wrongfully incriminate him.

¶ 98   On the other hand, the victim's testimony is corroborated, not only by her manager—who testified that the victim was crying, wet, and had disheveled hair—but also by Officer Reyes, emergency room nurse Kelly Sanabria, and Detective Barrett, who all testified to her post-rape condition. Additionally, when investigating the scene where the rape occurred, detectives found the victim's gloves and coffee mug, which were dropped during the attack. Finally, the defendant's DNA was found inside the victim.

¶ 99   The "defendant has the burden before this court to show that the evidence is closely balanced, [but] he had no burden to present any evidence or to testify himself at trial." *Piatkowski*, 225 Ill. 2d at 567. However, once he chooses to take the stand, we may consider his testimony when evaluating the closeness of the evidence. See *Sebby*, 2017 IL 119445, ¶ 61 (considering defendant's testimony when evaluating the closeness of the evidence); *People v. Boston*, 2017 IL App (1st) 140369, ¶ 86 (considering the inconsistencies in defendant's testimony and its conflicts with the testimony of other witnesses when evaluating the closeness of the evidence). We are unpersuaded that defendant has carried his burden before this court to show that the evidence was closely balanced. In addition, without a finding of clear or obvious error, there can be no reversal under the plain-error doctrine.

¶ 100                            VII. Sentencing Defendant to 100 Years

¶ 101        Defendant's final claim is that the trial court abused its discretion by sentencing him to a total of 100 years in prison with IDOC because the court failed to adequately consider factors in mitigation including defendant's lack of prior criminal history involving sex crimes, the hardship to his family, and his potential for rehabilitation.

¶ 102        "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800; *People v. Spicer*, 379 Ill. App. 3d 441, 465 (2007).

¶ 103        Defendant's 100-year sentence was within the statutory sentencing range, which the trial court observed was 66 to 120 years. Defendant's prior criminal history included a felony conviction for aggravated battery to a police officer and four misdemeanors: (1) misdemeanor domestic battery in 2001 with supervision terminated unsatisfactorily, (2) misdemeanor battery in 2007 with six months' probation which he violated, (3) driving under the influence in 2008, and (4) obstruction in 2010 which included an active warrant and the case being left unresolved. After each prior conviction, defendant continued to commit more offenses.

¶ 104        We cannot find that defendant's sentence was " 'manifestly disproportionate to the nature of the offense' " where defendant repeatedly and forcibly sexually assaulted the victim in the case at bar. See *Spicer*, 379 Ill. App. 3d at 465 (quoting *Jackson*, 375 Ill. App. 3d at 800). When the trial court sentenced defendant, it observed: "you talk about really horrible crimes[,] it's hard to top this one." When the trial court denied defendant's motion to reconsider sentence, the trial court observed:

> "THE COURT: The Court admits that the sentence of 100 years is a significant sentence, but based on the evidence that the jury heard and I heard also, [defendant] deserves every single day of that sentence. Based on the kidnapping, rape, the girl was turned ever[y] way but loose. Every part of her body she should get raped in, she was raped in it, and two different locations also. One in the snow, underneath a porch someplace, and another incident later on, and his absurd defense was she consented to some of it, someone else came along and did the rest of it. It's hard to explain DNA all over this girl, all over and inside of the girl as well.
>
> Your motion to reconsider sentence is denied."

The mitigating factors cited by defendant, such as the impact his incarceration will have on his family, do not render his sentence manifestly disproportionate in light of his recidivism, the possible sentencing range, and the lengthy sexual assault.

¶ 105                                          CONCLUSION

¶ 106        On this appeal, defendant claims that he was denied a fair trial by (1) the State's questions during defendant's cross-examination and the State's comments during closing argument that suggested that defendant bore the burden to produce his phone records, (2) the State's remark during closing argument, asking the jury to put themselves in the victim's shoes, and (3) the State's comment during closing argument that "everyone" in the courtroom "knows" the victim was raped. Defendant also claims that the trial court abused its discretion by sentencing him to a total of 100 years in prison with IDOC because the court failed to adequately consider

- 16 -

factors in mitigation including defendant's lack of prior criminal history involving sex crimes, the hardship to his family, and his potential for rehabilitation.

¶ 107 For the foregoing reasons, we do not find these claims persuasive and affirm defendant's conviction and sentence.

¶ 108 Affirmed.