2019 IL App (1st) 150489-U

FIRST DIVISION
December 2, 2019

No. 1-15-0489

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 21043 |
| | ) | |
| DONTA HUDSON, | ) | The Honorable |
| | ) | Maura Slattery Boyle |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for attempted murder is reversed where the State failed to prove that defendant performed an act that constituted a substantial step toward committing a murder. We remand to the circuit court for resentencing on the most serious remaining offense for which defendant was convicted.

¶ 2    Following a bench trial, defendant Donta Hudson was found guilty of one count of attempted murder (720 ILCS 5/8-4(a), 9-1 (West 2010)), one count of armed habitual criminal (AHC) (*id.* § 24-1.7(a)), four counts of unlawful use of a weapon by a felon (UUWF) (*id.* § 24-1.1(a)), four counts of aggravated unlawful use of a weapon (AUUW) (*id.* § 24-1.6(a)), and two

counts of aggravated assault (*id.* § 12-2(c)). The circuit court merged the counts and sentenced defendant to 25 years' imprisonment on the attempted murder conviction.

¶ 3    On appeal, defendant argues that the evidence was insufficient to convict him of attempted murder, as the State failed to introduce any competent evidence that he performed an act that constituted a substantial step toward committing a murder. He further argues that his trial counsel was ineffective for failing to object to certain portions of the State's forensic ballistics and testing expert's testimony. He does not challenge the sufficiency of the evidence for any of his other convictions. For the reasons that follow, we agree that defendant's attempted murder conviction must be vacated, and we remand to the circuit court for resentencing.

¶ 4                                   I. BACKGROUND

¶ 5    Defendant was charged with one count of attempted murder (*id.* § 8-4(a)), one count of AHC (*id.* § 24-1.7(a)), four counts of UUWF (*id.* § 24-1.1(a)), four counts of AUUF (*id.* § 24-1.6(a)), and two counts of aggravated assault (*id.* § 12-2(c)). He waived his right to a jury trial, and the matter proceeded to a bench trial.

¶ 6    Chicago police officer Lloyd Maxwell testified that on November 23, 2011, he was on a routine patrol in a marked police vehicle driving southbound on Kedzie Avenue approaching Chicago Avenue. At 1:30 p.m., he heard a police radio call of a man with a gun wearing a black coat and black jeans. Officer Maxwell activated his mars lights, siren, and car video camera. Near the intersection of Kedzie Avenue and Walnut Street, Officer Maxwell saw a man walking that fit the description. Officer Maxwell approached in his vehicle, and the man—whom Officer Maxwell identified in court as defendant—ran southbound down Kedzie Avenue. Officer Maxwell pursued defendant. When defendant turned into an alley, Officer Maxwell testified that he saw defendant's hand disappear briefly from view, and came back into view holding a

firearm. Defendant pointed his arm in a backward motion while continuing to run. Officer Maxwell testified that while defendant was pointing the gun, he "made a jerking motion with his arm back and forth twice." Officer Maxwell, who was about 10 to 15 feet away from defendant, did not hear or see any gunfire, and could not see if defendant pulled the trigger. A video of Officer Maxwell's pursuit of defendant, and of defendant pointing a gun at Officer Maxwell, was introduced into evidence.

¶ 7    Defendant continued to run through the alley before running through a vacant lot. Officer Maxwell exited his vehicle and pursued defendant on foot. Defendant ran past a row of apartments with a large courtyard in the middle, and Officer Maxwell, wary of running into an ambush, went to the side of a building before entering the courtyard. He saw defendant standing by himself behind a stairwell. Officer Maxwell saw a door slam shut for 3251 West Maypole Avenue, Apartment B1, which was only a few feet away from defendant. Officer Maxwell placed defendant under arrest and performed a custodial search, but did not find a gun on defendant's person or in the immediate area. Other officers arrived and entered the apartment. Inside the apartment, those officers placed Albert Davis[1] under arrest. When they exited the apartment, they were holding a black and blue steel handgun, which Officer Maxwell identified as the gun that defendant pointed at him.

¶ 8    Chicago police officer Jorge Lopez testified that on November 23, 2011, at 1:30 p.m., he was working with Officers Zablocki and Dolan.[2] Officer Lopez heard a radio call about a man with a gun, and heard Officer Maxwell respond that he saw a person matching the description.

---

[1]Defendant's trial was consolidated with Davis's trial. Davis was charged in a separate indictment with home invasion, residential burglary, and UUWF. The trial court found Davis guilty of residential burglary and UUWF, but acquitted him of the home invasion charge. On appeal, we affirmed Davis's UUWF conviction, but vacated his residential burglary conviction. *People v. Davis*, 2017 IL App (1st) 142263.

[2]Officer Zablocki's and Officer Dolan's first names do not appear in the record on appeal.

Officers Lopez, Zablocki, and Dolan went to the address of 3251 West Maypole Avenue and saw Officer Maxwell placing defendant under arrest. Officer Maxwell told them the door to apartment 1B had just slammed shut. Officer Lopez noticed that the door to the apartment was ajar, and he opened the door. The apartment's occupant consented to a search, and officers found a handgun in the freezer, which Officer Maxwell identified as the gun that defendant pointed at him.

¶ 9     Chicago police officer Joseph Keating, a firearms examiner working in the forensic firearms section, testified as an expert in the field of firearm forensic ballistics and testing. Defendant stipulated that Officer Keating was a forensic firearms expert. Officer Keating examined and tested the firearm recovered from Powell's freezer, a Llama IX-A, .45-caliber semiautomatic pistol. He testified that the gun was in good working condition. He explained that the gun was a single action and double action, and had three safeties: a grip safety, a gun safety, and a hammer safety. At the time the gun was recovered, one round was in the chamber and six rounds were in the magazine, meaning the gun was fully loaded. Officer Keating explained that when the magazine was loaded into the gun, the user would cycle the round into the chamber by pulling back on the slide, which would cock the hammer. The gun would then be a double action: pulling the trigger would cause the hammer to fall, simultaneously firing the weapon and causing the slide to slide back and re-cock the hammer. In order to safely carry the gun with a round in the chamber, the user would have to drop or lower the hammer, meaning move the hammer to a forward position so that it rode against the firing pin. The round recovered from the chamber had a dent in the primer, which resulted from the hammer of the gun resting against the firing pin and the firing pin resting against the round's primer. Officer Keating testified that this indicated that defendant had loaded the gun, cycled a round into the chamber, then lowered the

hammer so that it rested against the firing pin. During Officer Keating's testing of the gun, he recreated the indentation by lowering the hammer on to a round in the chamber. He was not able to determine whether the trigger had been pulled. He testified that the trigger could be pulled without the gun firing if (1) the hammer was down, (2) the hammer was back, i.e., cocked, but the user failed to grip the grip safety, or (3) if the hammer was cocked but the thumb safety was up.

¶ 10    Officer Keating further testified, without objection, that he was familiar with the concept of "shooter anticipation," which is where a person will anticipate a round being fired by attempting to counter the recoil that occurs when a round is fired. He testified that, "based on his experience," if he observed someone with a handgun jerking their hand forward, that would indicate to him that they were trying to fire the gun, and that they thought the gun would go off. Keating did not give any testimony as to what his experience was with shooter anticipation. On cross-examination, Officer Keating testified that the indentation on the primer was not caused by a misfire. Further, he could not give an opinion as to whether defendant "suffered" from shooter anticipation.

¶ 11    Defendant moved for a directed verdict on the attempted murder charge, which the circuit court denied. Defendant stipulated that he had a previous conviction for UUWF, that he was on parole on November 23, 2011, and that he did not possess a valid firearm owner's identification card. The circuit court found defendant guilty of all charges. Defendant's timely posttrial motion for a new trial was denied, and he filed a timely notice of appeal.

¶ 12                                    II. ANALYSIS

¶ 13    On appeal, defendant argues that the evidence at trial was insufficient to support an attempted murder conviction. His primary argument is that the State failed to present any

5

competent evidence from which a trier of fact could conclude that he pulled the trigger. He argues that none of the State's witnesses testified that he pulled the trigger, and that Officer Keating's testimony regarding shooter anticipation lacked a sufficient basis. He further argues that his trial counsel provided ineffective assistance by failing to object to Officer Keating's testimony regarding shooter anticipation. We agree that defendant's attempted murder conviction and sentence should be vacated, and do not reach defendant's ineffective assistance of counsel argument.

¶ 14    "[T]he State carries the burden of proving beyond a reasonable doubt each element of an offense." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When a defendant challenges the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the State, and we must determine whether any rational trier of fact could have found beyond a reasonable doubt that the State proved each essential element of the crime. *Id.* We will not substitute our judgment for that of the trier of fact on issues of the weight of the evidence or the witnesses' credibility. *Id.* "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 15    To prove that defendant committed attempted murder, the State was required to prove that defendant, without lawful justification and with an intent to kill, pointed a loaded gun at Officer Maxwell and pulled the trigger, which constituted a substantial step towards committing murder. 720 ILCS 5/8-4(a), 9-1 (West 2010). "Intent is a state of mind which can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Brown*, 2015 IL App (1st) 131873, ¶ 14. Here, the State presented evidence that defendant pointed a loaded

gun at Officer Maxwell, and that he made two jerking motions with his hand in Officer Maxwell's direction while running away from the officer. The State contends that the circumstantial evidence of defendant's intent to kill is similar to that in *People v. Spiezio*, 191 Ill. App. 3d 1067 (1989). In *Spiezio*, the defendant was charged with attempted murder for pointing a loaded gun at a police officer's head and stating "fuck you coppers" while the officer was four or five feet away. *Id.* at 1070-71. The officer jumped on the defendant and a struggle ensued, during which defendant again pointed the gun at the officer. *Id.* Another officer joined the struggle, and the officers managed to get the gun away from the defendant, who continued to struggle until he was placed in handcuffs. *Id.* We found that "there was sufficient circumstantial evidence of intent to kill to support the jury's verdict where defendant pointed a loaded gun at the police officer from close range, while yelling, 'fuck you coppers.'" *Id.* at 1074.

¶ 16    The evidence here from which to infer that defendant had an intent to kill is unsatisfactory. In *Spiezio*, the State introduced evidence that the defendant pointed the gun at the officer's head, whereas here, the evidence was simply that defendant pointed the gun at Officer Maxwell. There, the officer was just a few feet away from the defendant, whereas here, Officer Maxwell was following defendant in a car and was approximately 10 to 15 feet away when defendant pointed the gun. There, the defendant yelled "fuck you coppers" while pointing the gun directly at the officer's head, whereas here, there was no evidence of any statements by defendant, who was running away from Officer Maxwell. We find that the evidence here is so unsatisfactory that it cannot support a finding of an intent to kill

¶ 17    We further find that State failed to prove beyond a reasonable doubt that defendant took any substantial step toward committing murder. The State's theory at trial was twofold: (1) that the impression on the primer of the round found in the chamber indicated that defendant might

have tried to pull the trigger, and (2) that the jerking motion of defendant's arm while he was aiming the gun at Officer Maxwell was attributable to defendant's anticipation of the gun's recoil. Neither of these theories finds sufficient evidentiary support to allow for an inference that defendant pulled the trigger while pointing the gun at Officer Maxwell.

¶ 18    The State argues in its brief that

> "From [Officer Keating's] testing, he determined that the indentation of [*sic*] the bullet was caused by the trigger being pulled when the bullet was in the chamber; [*sic*] which caused the lowering of the hammer, and the hammer rested on the firing pin, which then rested on the primer portion of the bullet. *** The hammer being forward, corroborated by the fact that there was an indentation in the primer, explains why when defendant pulled the trigger, the gun did not fire a bullet toward the officer."

¶ 19    At best, the State mischaracterizes Officer Keating's testimony. The following Officer's Keating's testimony verbatim:

> "Q. What do you see in People's Exhibit Number Seven?
>
> A. I see—well, Exhibit Number Seven is what I duplicated. The exact marks from the hammer being left on the firing pin, which is basically applied pressure, minimal pressure to the primer. Primer of the cartridge.
>
> Q. In other words, is it fair to day [*sic*] you recreated the indentation that was inside the round recovered from the chamber?
>
> A. Yes, I did.
>
> Q. How did you recreate that indentation?

A. I pulled the bullet. This is for safety reasons. I'm only trying to produce the mark on the primer. I pulled the bullet, took out the gunpowder in case of it going off, which it didn't. It left the exact same indentation. The indentation was caused from the live round in the chamber, caused from lowering the hammer. You know what I mean. This is the indentation.

Q. From your tests, *were you able to tell whether the trigger was pulled on that firearm when the bullet was in the chamber*?

A. *Only to lower the hammer. Other than that, no.*

Q. Is it that the trigger wasn't pulled or you can't determine?

A. *I can't determine if the trigger was pulled.* You know what I mean? To fire it, you mean?

Q. Correct.

A. Correct.

Q. What can you determine?

A. *What I can determine is that somebody loaded the live cartridge into there, and lowered the hammer, in such a manner. You know, they lowered the hammer in such a manner as this.*

Q. Officer Keating, is there a scenario or are there scenarios under which the gun could be in the condition you described it, the trigger could be pulled and bullet would not fire?

A. Yes.

Q. How could that happen?

A. Okay, the gun is cleared and safe. Okay. For you to pull the trigger, and gun did not off, one, is if the hammer is down. It will not fire. Two, if the hammer is back and you do not grip the grip safety, the gun will not go off. Of, third, if you have the thumb safety up, with hammer cocked, you pull the trigger, nothing would go off." (Emphases added.)

¶ 20    Officer Keating did not testify that the indentation was caused by defendant pulling the trigger; he testified that the indentation was caused by the gun being loaded and the hammer being dropped. He also testified that there were three scenarios in which the loaded gun would not fire. Elsewhere he testified that a person could safely carry the gun with a round in the chamber by lowering the hammer. In order to fire the gun, the person would have to cock the hammer back before pulling the trigger. Officer Keating acknowledged that he could not tell whether the trigger had been pulled. Simply put, there was no evidence that the indent on the primer was caused by defendant pulling the trigger, nor was there any evidence that the indentation on the primer occurred while defendant was running from Officer Maxwell. Furthermore, there was absolutely no testimony that anyone saw defendant pull the trigger while he was pointing the gun at Officer Maxwell. Under the facts before us, the mere presence of an indentation on the primer of the round recovered from the gun's chamber was insufficient to support an inference that defendant pulled the trigger while pointing the gun at Officer Maxwell.

¶ 21    The State's second theory was that defendant's hand jerked twice while he was pointing the gun at Officer Maxwell. The State contends that this was sufficient evidence from which the circuit court could conclude that defendant was attempting to pull the trigger while pointing the gun at Officer Maxwell. The State further contends that defendant forfeited any argument related

to Officer Keating's testimony on the issue of shooter anticipation because he failed to object at trial.

¶ 22    We agree with the State that defendant forfeited his objections to Officer Keating's testimony by failing to object during trial. In order to preserve an alleged error for appellate review, a defendant must make a specific objection at trial and raise that issue again in a posttrial motion. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50. Here, defendant did not object to Officer Keating's testimony regarding shooter anticipation during trial or in his posttrial motion for a new trial. He has therefore forfeited any objection to the circuit court's admission of Officer Keating's testimony regarding shooter anticipation into evidence.

¶ 23    Notwithstanding defendant's forfeiture, Officer Keating's testimony regarding shooter anticipation, even if properly admitted, is not sufficient to support a conviction for attempted murder. Officer Keating was familiar with the concept of shooter anticipation, but he did not give an opinion as to whether defendant "suffered" from shooter anticipation. He offered no testimony regarding defendant's experience with firearms, or whether defendant's actions supported a conclusion that shooter anticipation was present here. No reasonable inferences can be drawn from Officer Keating's testimony that, when considered with the remaining competent evidence, supports an attempted murder conviction.

¶ 24    There was no other evidence in the record from which the circuit court could have inferred that defendant pulled the trigger, and we find that the State failed to prove beyond a reasonable doubt that defendant performed an act that constituted a substantial step toward committing a murder. Defendant's conviction for attempted murder is reversed and the circuit court's sentence on that conviction is vacated. Defendant has not challenged the sufficiency of

11

the evidence for any of his remaining convictions, so we remand this matter to the circuit court for resentencing on the most serious remaining offense for which defendant was convicted.

¶ 25    As we have reversed defendant's conviction for attempted murder, we need not address his alternative argument that his trial counsel was ineffective.

¶ 26                                  III. CONCLUSION

¶ 27    For the foregoing reasons, defendant's conviction for attempted murder is reversed, his sentence on that conviction is vacated, and we remand to the circuit court to resentence defendant on his unchallenged convictions.

¶ 28    Reversed in part; vacated in part; remanded for resentencing.