2022 IL App (1st) 201052-U

SECOND DIVISION
June 28, 2022

No. 1-20-1052

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 17 CR 18014 |
| ANTHONY CONNER, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Joseph M. Claps, |
| | ) | Judge Presiding. |
| | ) | |
| | ) | |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Lavin concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The prosecutor's comments during closing argument did not misstate the law regarding proximate cause and therefore did not rise to the level of plain error warranting review. The circuit court did not abuse its discretion in sentencing the defendant to a term of only one year above the statutory extended-term minimum.

¶ 2    After a jury trial in the circuit court of Cook County, the defendant, Anthony Conner, was

found guilty of one count of resisting or obstructing a correctional institution employee (720 ILCS 5/31-1(a-7) (West 2018)) and sentenced to four years' imprisonment. On appeal, the defendant contends: (1) that the prosecutor misstated the law in closing argument thereby denying him a fair trial; and (2) that his four-year extended term sentence was excessive in light of his work history, family support, and ongoing struggle with mental illness. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       The record before us reveals the following relevant facts and procedural history. In September 2018, the defendant was charged with one Class 4 felony count of resisting or obstructing a correctional institution employee in violation of section 31-1(a-7) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/31-1(a-7) (West 2018)). The charge stemmed from an incident that occurred in Cook County jail while the defendant was awaiting trial in a separate case.

¶ 5       On October 9, 2019, the defendant proceeded with a jury trial at which the following relevant evidence was adduced. The victim, Officer Johnathan White, a correctional officer with the Cook County Sheriff's Department, testified that on May 6, 2017, he was working in his official capacity, and was assigned to the 3 p.m. to 11 p.m. shift in Division 6 of the Cook County jail. At some point during his shift, Officer White received a radio transmission asking him to proceed to tier 2P. Once there, the officer entered the dayroom, and observed six or seven correctional officers, and two detainees, one standing next to the telephones and another sitting underneath them. The officer identified the defendant as the detainee sitting underneath the phones.

¶ 6       According to Officer White, the commanding sergeant ordered the detainee who was standing to "lock up." Officer White explained that "lock up" meant that the inmate was being asked to return to his cell. Officer White observed the detainee comply with the sergeant's

command by turning around to be handcuffed and permitting the officers to escort him to his cell on the second floor.

¶ 7    Officer White averred that the sergeant then ordered the defendant, who had remained seated on the ground throughout, to also "lock up." The defendant, however, ignored the sergeant and remained seated. The sergeant repeated his command two or three times, but the defendant continued to ignore him. At this point, the sergeant issued an order to Officer White and his partner, Officer Klinger, to escort the defendant to his cell. While another officer handcuffed the defendant, Officers White and Klinger lifted the defendant off the ground. The defendant, however, "became deadweight," or "slump," refusing to walk. The officers had to carry him, by looping their arms around him. They held the defendant "by his shoulders" to "support him," with Officer White on the right, and Officer Klinger on the left.

¶ 8    Officer White further averred that as they proceeded towards the stairs, the defendant "swept his legs in split motion" and in an outward pattern causing Officer White to trip. Officer White fell onto ground. The defendant then fell on top of Officer White and Officer Klinger fell on top of the defendant. In that instant, Officer White felt sharp pain in his right arm, elbow, shoulder, and knee.

¶ 9    Upon the sergeant's command, Officer White disengaged from the defendant and then stood in the dayroom grasping his arm in pain, while the remaining officers lifted the defendant and carried him to his cell.

¶ 10    Officer White was later treated at the hospital for injuries to his shoulder. He did physical therapy for several months, and subsequently underwent surgery. He stated that he continues to feel pain from his injury.

¶ 11    On cross-examination, Officer White admitted that he was 5 feet 11 inches tall and weighed

about 215 pounds. He stated, however, that he was not aware that at the time of the incident, the defendant weighed only 150 pounds.

¶ 12    On cross-examination, Officer White further averred that he could not recall whether prior to being picked up from the ground the defendant told the officers that he had been given permission to use the telephone in the dayroom by another correctional officer.

¶ 13    In addition, when asked whether detainees were expected to remain on the ground whenever there was a disturbance in the jail, the officer confirmed that they were, but added that they were expected to lie face down on their stomachs.

¶ 14    Cook County Sherriff's Department Sergeant Charles Gray[1] next testified consistently with Officer White. Sergeant Gray stated that at about 8:30 p.m., on May 6, 2017, he was on duty in Division 6 of Cook County jail, when he was called to respond to an incident on tier 2P. After proceeding to that location, Sergeant Gray observed two detainees, one of whom he identified as the defendant, next to telephones, refusing to "lock up." The sergeant stated that the defendant was initially standing next to the telephones but then sat down, while the other detainee remained standing throughout the incident.

¶ 15    The sergeant testified that when he first arrived in the dayroom, he attempted to "deescalate the situation" by inquiring "what the issue was." After learning from the detainees that they wanted to use the telephones, the sergeant ordered them to "lock up" because it was medication time. Sergeant Gray explained that while inmates are free to walk around the tiers, watch television, shower, and use the telephones, during "lock up," the telephones are shut off.

¶ 16    According to Sergeant Gray, while the first detainee complied with his command and was

---

[1] The sergeant's name is unclear from the record. In the pretrial conference listing the names of the intended witnesses, the sergeant is referred to as Charles Gray. However, during trial, he is referred to, albeit only once, as "Sergeant Greg." Because we believe that the latter reference is a typographical error, for purposes of this appeal, we will refer to him as Sergeant Gray.

handcuffed and escorted to his cell, the defendant continued to remain seated and refused to move even after three verbal commands.

¶ 17    The sergeant therefore ordered his officers to pick up the defendant and escort him to his cell. The officers handcuffed the defendant, and assisted him to his feet, but the defendant "dropped his weight." Upon the sergeant's further command, the officers again picked up the defendant and held him to walk him to his cell. Sergeant Gray was behind Officer White and Officer Klinger as they started moving the defendant, when he observed the defendant dragging his feet and pushing his legs out. When the defendant pushed his foot out a second time, it "made contact with" Officer White and "they fell over." Specifically, the defendant fell over Officer White, and Officer Klinger fell forward.

¶ 18    After Officer White fell, Sergeant Gray ordered the remaining officers to pick up the defendant and carry him to his cell by grabbing his legs and his arms so that he could not touch the floor. Once the defendant was escorted to his cell, he was placed on the ground with his hands handcuffed behind his back. The officers attempted to take off the handcuffs, but after one cuff was removed, the defendant moved both his arms underneath his body, and continued to disregard verbal orders to release his hands. Sergeant Gray warned the defendant that if he continued to disobey, he would be "OC sprayed," which is "like pepper spray." After the defendant continued to disobey and out of concern that the handcuff could be used as a weapon against his staff, the sergeant pepper-sprayed the defendant.

¶ 19    According to Sergeant Gray, at this point, the defendant complied with his commands, was re-handcuffed, and escorted out of the cell to be decontaminated, *i.e.*, taken to an area where the pepper spray could be rinsed off. Sergeant Gray did not follow the defendant to be decontaminated

because one of his officers, Officer White, was injured.

¶ 20    Sergeant Gray also testified that his officers followed proper procedures throughout the incident and that the defendant, at no time, either while being escorted to his cell or after his fall, made any verbal complaints that he was in pain.

¶ 21    On cross-examination, Sergeant Gray acknowledged that he has had his arms lifted while handcuffed behind his back and that it hurts. He also agreed that Officer Klinger was both taller and heavier than the defendant, and that Officer White was probably almost the same height but heavier than the defendant.

¶ 22    On cross-examination, the sergeant further claimed that he could not recall whether, while he was sitting on the ground, the defendant asked to speak with a lieutenant because "he needed to make a phone call."

¶ 23    In addition to the testimony of the two correctional officers, the State also introduced into evidence video footage of the dayroom, documenting what transpired between the correctional officers and the defendant.

¶ 24    The video footage captures the dayroom from a top corner. It shows the central area with four picnic tables and a television set hanging on the right wall. Two staircases lead to cells that encircle the dayroom on the upper and lower levels. The cell doors on the upper level are visible because the hallway opens onto the dayroom.

¶ 25    The video footage initially captures numerous inmates walking around the dayroom, eating, talking, and climbing the stairs to the upper and lower hallways to go in and out of their cells. After a while, all the inmates head back into their cells. Only two remain in the dayroom: the defendant and the second detainee. The defendant merely remains standing next to a door on the right wall, holding a notebook. The second detainee keeps walking around the dayroom, in an

agitated state, climbing the picnic tables.

¶ 26    Soon after, approximately seven or eight correctional officers and their supervisor enter the room. The officers encircle the detainees and spend approximately five minutes engaged in conversation with them. Since the surveillance footage contains no audio, we do not know what is being said. The camera only reveals that the defendant is standing, mostly quiet and not saying much, while the second detainee is talking animatedly, gesticulating, and appealing to the sergeant. The camera also captures one of the correctional officers in the circle making a side comment to the defendant and smiling. Throughout this time, the defendant does not appear to be threatening or arguing with anyone.

¶ 27    The defendant then disappears from the camera's view, as he presumably sits down on the ground. The second detainee is then seen being handcuffed by the officers and escorted to his cell. The remaining correctional officers turn towards the defendant and walk over to him. It is impossible from the camera angle to tell what transpires between the defendant and the officers at this point. The next thing that is visible are the officers lifting the defendant, who is handcuffed behind his back. The defendant then drops out of the camera's purview again, presumably to the ground. The camera next shows two officers lifting the defendant and carrying him towards the stairs on the opposite side of the room. From the camera's angle, it is impossible to see whether the defendant is saying anything to the officers because his head is turned away. The defendant's feet are initially dragging on the floor, but then make an outward and inward motion, upon which one of the officer's trips and everyone falls to the ground. The officer on the right stands up holding his arm.

¶ 28    At this point, all the officers swarm in on the defendant, and he is carried by his legs and feet, face down, into a cell on the upper floor. All the officers converge into the cell and remain

7

there for the next few minutes, after which, they exit, coughing and rubbing their eyes. The defendant is then seen in handcuffs, as he is escorted from the cell to the lower level and out of the camera's purview.

¶ 29    After the video surveillance footage was played for the jury, the State also called Dr. Venhat Sheshadri, the orthopedic surgeon who treated Officer White's shoulder injury. Dr. Sheshadri testified that he first saw Officer White in May 2017, for pain in his shoulder arising from a traumatic injury. After reviewing the officer's x-rays and performing an MRI, Dr. Sheshadri diagnosed the officer with a superior labral tear of the shoulder. Dr. Sheshadri initially prescribed physical therapy and a cortisone shot, but after the officer's pain persisted, he recommended surgery.

¶ 30    On cross-examination, Dr. Sheshadri admitted that the surgery (an arthroscopy) was minimally invasive and revealed only soft tissue injury, and no bone fractures.

¶ 31    After the State rested, defense counsel moved for a directed verdict, arguing that the State had failed to prove that the defendant was resisting Officer White and had acted knowingly. Counsel further argued that the evidence did not establish that the defendant was the proximate cause of Officer White's injuries. The court denied the motion.

¶ 32    In his case-in-chief, the defendant testified on his own behalf. He averred that in the evening hours of May 6, 2017, he was in Division 6, tier 2P of the Cook County jail. The defendant was waiting to use the telephone because a correctional officer had permitted him to do so while "they were running the med line." The defendant explained that during "the med line" individual detainees were taken out of their cells to receive medication while others remained locked inside. According to the defendant, while he was waiting to use the telephone, another detainee became upset because he had not been allowed to do the same. The detainee refused to go back into his

cell and instead asked to speak to someone. "When they called refusal" regarding that detainee, numerous officers entered the dayroom.

¶ 33    The defendant testified that prior to this, no one told him to "lock up." After the officers entered the dayroom, one of them told him to stay out of the way so that he could speak with the officers after they finished with the other detainee. The defendant averred that at this point he sat down on the ground  because "he didn't want any problems," and waited for the other detainee to finish speaking with the officers. The defendant explained that whenever a fight breaks out or there is trouble, the officers ask the detainees to get on the ground and lie down. The defendant stated that he did not want to lie down so instead he sat on the ground.

¶ 34    According to the defendant, once the other detainee finished speaking with the officers, he was handcuffed and escorted to his cell. The sergeant then turned to the defendant and asked him why he wanted to use the telephone. The defendant, who remained seated throughout this time, responded that he wanted to speak with his attorney about his case. The defendant also asked to speak to the sergeant's superior, a lieutenant, because "the sergeant wasn't trying to hear [him] out at all."

¶ 35    The defendant testified that once he asked for the sergeant's superior the officers swarmed around him and handcuffed his hands behind his back. The defendant was asked to stand up and complied. At this point, however, the officers began pushing his handcuffed arms behind his head, which caused him pain. The defendant testified that he did not attempt to resist. Instead, he tried to tell the officers that he was in pain and that the way they were contorting his body made it difficult for him to walk. The officers ignored the defendant's complaints and continued to push his arms up and his head down.

¶ 36    The defendant stated that as they were pulling him, he tried to plant his feet on the ground

to avoid the pain and to make them stop. At this point, everyone fell to the ground. The defendant averred that he did not try to trip anyone. Instead, when he started to fall, he tried to stop himself but could not because he was handcuffed. The defendant could not remember on which officer he fell or whether he fell directly onto the officer, at all, but stated that he did not fall on purpose.

¶ 37    The defendant testified that once he fell, all the officers grabbed and carried him to his cell where he was "dropped" on the ground, while still in handcuffs. One of the officers placed his foot on the defendant's neck, while another placed his foot on the defendant's back. Still other officers held the defendant down with their knees and tried to unhandcuff him. The sergeant sprayed the defendant with mace even though he was still handcuffed.

¶ 38    The defendant stated that he was then taken to a basement room with a sink where the officers tried to get him to wash the pepper spray off his face. The defendant told the officers that he could not do so while his hands remained cuffed behind his back. He was then asked to sit down in a chair and did so until the morning.

¶ 39    On cross-examination, the defendant admitted that before the officers attempted to escort him out of the dayroom, the sergeant asked him at least once to "lock up." He acknowledged that instead of obeying the sergeant, he remained seated and asked the sergeant to let him speak to the lieutenant.

¶ 40    On cross-examination, the State also introduced video footage from the basement where the defendant was taken after he was pepper sprayed. The defendant acknowledged that the footage shows him being led in handcuffs into a room with a sink and then being unhandcuffed so that he could wash his face.

¶ 41    The State also introduced into evidence a certified copy of the defendant's August 8, 2017,

conviction for aggravated vehicular hijacking with a firearm.

¶ 42    After the defendant rested, the parties proceeded with closing arguments. The State argued that in order for the jury to find the defendant guilty of resisting or obstructing a correctional institution employee, the jury had to find that: (1) Officer White was a correctional institution employee; (2) the defendant knew that Officer White was a correctional institution employee; (3) the defendant knowingly resisted or obstructed the performance by the officer of an authorized act within the officer's official capacity; and (4) when the defendant did so, he proximately caused the officer's injuries. After elaborating on the first three elements necessary to sustain the charge, the prosecutor explained proximate cause in the following manner:

> "What does proximately caused mean? Use your common sense. That [the defendant] is the reason that Johnathan White got hurt.
>
> Again, look at the entire incident. If the defendant had stood up and walked to his cell like the other detainee did, Johnathan White wouldn't have gotten hurt. If the defendant had stood up and began to put the cuffs behind his back, they wouldn't have had to physically lift him up. Johnathan White wouldn't have gotten hurt.
>
> If the defendant didn't decide, this is my time, this is what I don't want to listen to and hadn't put his leg out, Johnathan White wouldn't have got hurt. It is not because Officer Klinger fell on him. It is not because there is an accompany of bodies falling down there and it just happened that way. No. It only happened because the defendant decided I am not going to listen to the rules today, and because he decided to drag—put his foot out and put them to the ground, Johnathan White got hurt. The defendant is the proximate cause of the injuries. He is the reason that John, that White, got hurt. Period."

¶ 43    After defense counsel argued that Officer White's fall was an accident, in rebuttal, the

11

prosecutor elaborated on the definition of proximate cause, stating:

> "My partner talked to you about the proximate cause in this case. You are going to get an instruction that defines that, but lawyers can't help but define words that everyone knows the meaning of.
>
> The term proximate cause means any cause which, in the natural or probable sequence, produced the injury to a correctional institution employee. What does that mean? As my partner put it, but for the acts of this defendant, Officer White would never have been hurt.
>
> This is not an accident. This is not a case of feet being tangled up. That camera, which is positioned behind the action, shows you, as they start to move the defendant towards the stairs, his feet went down once, twice, and everyone goes down. But for the actions of this defendant, Officer White would not have been injured."

¶ 44    After closing arguments, the court instructed the jury. Relevant to this appeal, the court stated: "The term proximate cause means any cause which in the natural or probable sequence produced the injuries to a correctional institution employee."

¶ 45    After deliberations, the jury found the defendant guilty. The defendant filed a motion for a new trial arguing that the State failed to prove that he knowingly resisted the officers and that he was the proximate cause of Officer White's injuries. The court denied the defendant's motion and the parties proceeded to sentencing.

¶ 46    At the sentencing hearing, the State sought the imposition of an extended term sentence based on the defendant's prior criminal background. Specifically, the State pointed out that at the time the defendant resisted Officer White, he was in Cook County jail on a charge of aggravated vehicular hijacking with a firearm, for which he was subsequently convicted and sentenced to 21 years' imprisonment. The State further pointed out that the defendant had one prior felony

conviction for unlawful possession of a handgun and two convictions for misdemeanor offenses.

¶ 47    Defense counsel, on the other hand, argued against the imposition of an extended term sentence. In mitigation, counsel asserted that the defendant had strong family support and rehabilitative potential. Counsel pointed out that the defendant grew up without a father and was raised by his grandmother, but nonetheless never joined a gang. While the defendant had problems with substance abuse early on in his life, he was able to quit, finish high school and express regret for his past choices. In addition, counsel maintained that the defendant's diagnosis of impulsive disorder may have played a role in the charged offense. Counsel therefore sought a one-year sentence, with credit given.

¶ 48    After considering the arguments and reviewing the defendant's presentence investigation report (PSI), the circuit court sentenced the defendant to an extended term of four years' imprisonment, explaining:

> "As far as being extended, I'm granting the State's request over your objection. It's extended from 1-to-3 to 3-to-6. I'm also considering in aggravation and mitigation, the depth of the injury and, additionally, it's my judgement watching the defendant testify in the jury trial that he made an attempt to sway the jury regarding how he was treated after he was sprayed with pepper spray or mace or whatever it was. I don't think that was a lack of memory. I think he purposely did that. He maybe forgot there's a video of everything that happened. It's clear to me that he intentionally provided false information. That's aggravation. At any rate, I'm also considering the mitigation argument you made about some of his problems so I'm taking that into consideration as well as his age. The defendant is, therefore, sentenced to four years in the Department of Corrections which is

13

consecutive."

¶ 49    Defense counsel filed a motion for resentencing arguing, *inter alia*, that the sentence was excessive. The motion was denied. The defendant now appeals.

¶ 50                                    II. ANALYSIS

¶ 51    On appeal, the defendant first contends that during closing argument the State misstated the law regarding an element of the crime, namely proximate cause, thereby denying him a fair trial. The defendant concedes that he forfeited this issue by failing to properly object to it below and to specifically raise it in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *People v. Wood*, 214 Ill. 2d 455, 470 (2005) (A "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve an alleged error for review.") He nonetheless asks this court to review his argument under the first prong of the plain error doctrine.

¶ 52    The plain error doctrine is a narrow and limited exception to the general rule of forfeiture, which "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron,* 215 Ill. 2d 167, 186-87 (2005)); see also *People v. Fort*, 2017 IL 118966, ¶ 18; *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58. Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *Anaya*, 2017 IL App (1st) 150074, ¶ 58; see also *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 29 (citing *People v. Lewis*, 234 Ill. 2d 32, 43

(2009)).

¶ 53    "There can be no plain error if there was no error at all." *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010). Accordingly, the first step in any plain-error analysis "is to determine whether any error occurred." *Lewis*, 234 Ill. 2d at 43. This requires "a substantive look" at the issues raised. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). We therefore first examine the defendant's claim to determine whether there was any error.

¶ 54    On appeal, the defendant contends that during closing arguments, the prosecutor repeatedly and erroneously misstated the law on proximate cause. Specifically, he argues that the prosecutor improperly equated two distinct elements of proximate cause, actual cause, and legal cause, thereby lowering the State's burden of proof. For the following reasons, we disagree.

¶ 55    It is axiomatic that a prosecutor is allowed wide latitude during closing argument. *Anaya*, 2017 IL App (1st) 150074, ¶ 62. The prosecutor may: comment on facts presented in evidence or upon reasonable inferences drawn from that evidence; attack the defendant's theory of defense; respond to comments made by defense counsel which clearly invite response; and comment on the credibility of witnesses. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57; *Anaya*, 2017 IL App (1st) 150074, ¶ 62. The prosecutor may not, however, misstate the law or attempt to shift the burden of proof to the defense. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 31. Nonetheless, even such errors will not merit reversal unless they result in substantial prejudice to the defendant. *Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Substantial prejudice occurs only "if the improper remarks constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 56    In reviewing the propriety of the prosecutor's comments, we evaluate the comments in context of the entirety of the closing argument. *Id*. Although at present, our courts disagree as to

whether we review such claims *de novo* or for abuse of discretion (*People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 76-78; see also *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009) (comparing *Wheeler*, 226 Ill. 2d at 121 ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."), with *People v. Blue*, 189 Ill. 2d 99, 132 (2000) ("[W]e conclude that the trial court abused its discretion" by allowing various prosecutorial remarks during closing argument))), we find that the outcome here is the same regardless of the applicable standard of review.

¶ 57    A review of the entirety of the prosecutor's remarks in the instant case, reveals that the prosecutor neither misstated the law nor shifted the burden of proof when explaining proximate cause to the jury. In closing argument, the prosecutor first explained the four propositions that the State was required to prove to establish that the defendant was guilty of resisting or obstructing Officer White. 720 ILCS 5/31-1(a-7) (West 2018).The prosecutor pointed out that it was the State's burden to prove beyond a reasonable doubt each of the following elements: (1) that Officer White was a correctional institution employee; (2) that the defendant knew Officer White was a correctional institution employee; (3) that the defendant knowingly resisted or obstructed Officer White's performance of an authorized act within his official capacity; and (4) that, in doing so, he was the proximate cause of Officer Whites' injuries. *Id*.

¶ 58    With respect to the fourth proposition, the prosecutor relied on the definition of proximate cause found in Illinois Criminal Pattern Jury Instruction 4.24 with which the jury was subsequently instructed. See IPI, Criminal, No. 4.24 (4th ed. Supp. 2011) ("The term "proximate cause" means any cause which, in the natural or probable sequence, produced the *** (injury to a peace officer). ***"). Following the language of that instruction, in opening argument, the prosecutor first

explained:

"What does proximately caused mean? Use your common sense. That [the defendant] is the reason that Johnathan White got hurt.

Again, look at the entire incident. If the defendant had stood up and walked to his cell like the other detainee did, Johnathan White wouldn't have gotten hurt. If the defendant had stood up and began to put the cuffs behind his back, they wouldn't have had to physically lift him up. Johnathan White wouldn't have gotten hurt.

If the defendant didn't decide, this is my time, this is what I don't want to listen to and hadn't put his leg out, Johnathan White wouldn't have got hurt. It is not because Officer Klinger fell on him. It is not because there is an accompany of bodies falling down there and it just happened that way. No. It only happened because the defendant decided I am not going to listen to the rules today, and because he decided to drag—put his foot out and put them to the ground, Johnathan White got hurt. The defendant is the proximate cause of the injuries. He is the reason that John, that White, got hurt. Period."

¶ 59 Further, in rebuttal, the prosecutor clarified:

"The term proximate cause means any cause which, in the natural or probable sequence, produced the injury to a correctional institution employee. What does that mean? As my partner put it, but for the acts of this defendant, Officer White would never have been hurt.

This is not an accident. This is not a case of feet being tangled up. That camera, which is positioned behind the action, shows you, as they start to move the defendant towards the stairs, his feet went down once, twice, and everyone goes down. But for the actions of this defendant, Officer White would not have been injured."

¶ 60 The defendant asserts that these comments were misleading. In doing so, he does not

17

challenge the prosecutor's legal description of cause in fact, but rather asserts that the prosecutor failed to explain the element of legal cause as a necessary part of the proximate cause analysis.

¶ 61      At the outset, we agree with the defendant that just as in civil matters, in criminal cases, " 'proximate cause' describes two distinct requirements: cause in fact and legal cause." *People v. Hudson*, 222 Ill. 2d 392, 401 (2006).[2] Cause in fact exists when a defendant's actions are "a material element and a substantial factor in bringing about the injury," or when "but for" the defendant's conduct the injury would not have occurred. See *People v. Mumaugh*, 2018 IL App (3d) 140961, ¶ 28; see also *Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 23.

¶ 62      Legal cause, on the other hand, is "essentially a question of foreseeability." *Hudson*, 222 Ill. 2d at 401. An injury is foreseeable if it is "of a type that a reasonable person would see as a likely result of his or her conduct." *Id*. While the extent of the injury or the exact way it occurred need not be foreseeable (*Stanphill v. Orgberg*, 2017 IL App (2d) 161086, ¶ 32), the injury should not be so highly improbable that imposing liability would not be justified (*Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992)). In other words, "even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result." (Internal quotations omitted.) *Hudson*, 222 Ill. 2d at 401.

¶ 63      Contrary to the defendant's position, however, the prosecutor was not required to use the term "foreseeable" or explain the difference between the concepts of cause in fact and legal cause to the jury. See *Hudson*, 222 Ill. 2d at 401. While foreseeability is an essential component of

---

[2] Our supreme court has held that the civil definition of proximate cause applies in criminal cases. See *Hudson*, 222 Ill. 2d at 401 (" 'causal relation is the universal factor common to all legal liability' ") (quoting *People v. Lowery*, 178 Ill. 2d 452, 466 (1997)). In addition, this appellate court has previously applied the civil definition of proximate cause to a charge of resisting a peace officer brought pursuant to section 31-1(a-7) of the Code (720 ILCS 5/31-1(a-7) (West 2018)) pursuant to which this defendant was convicted here. See *People v. Cervantes*, 408 Ill. App. 3d 906, 909 (2011).

proximate cause analysis, our supreme court has held that it need not be explicitly discussed to communicate the idea of "proximate" to the jury. See *Hudson*, 222 Ill. 2d at 401.

¶ 64      The decision in *Hudson* is instructive. In that case, our supreme court considered whether a non-pattern criminal jury instruction in a felony murder trial using the phrase "[the defendant] set in motion a chain of events which cause[d]" the death of the victim, regardless of whether the death was "intentional or accidental," properly apprised the jury of the law regarding legal causation. *Id.* at 406. The court found that while the phrase "direct and foreseeable consequence" may have been more precise, the language used was nonetheless sufficient to apprise the jury of the State's burden regarding foreseeability and therefore not a misstatement of the law. *Id.* at 406-08. As the court explained: "Although foreseeability is a necessary component of a proximate cause analysis, it need not be specifically mentioned in a jury instruction to communicate the idea of proximate cause to a jury." *Id.* at 401.

¶ 65      While the present case does not involve a jury instruction, but rather closing arguments by counsel, the principles articulated in *Hudson* apply with equal force. This is particularly true since "a prosecutor's misstatement of law during closing arguments" will normally not constitute reversible error when the jury is properly instructed on the law, because closing arguments "are construed to carry less weight with the jury than do the instructions from the trial court." *People v. Jackson*, 2012 IL App (1st) 09283, ¶ 36.

¶ 66      Here, the jury was properly instructed on proximate cause. Accordingly, applying *Hudson*, we find that the prosecutor's comments did not misstate the law or lowered the burden of proof. Just as in *Hudson*, the prosecutor's use of the phrase "natural and probable sequence" sufficiently apprised the jury of the idea of foreseeability.

¶ 67      Regardless, even if we were to find that the prosecutor's comments were made in error, we

would nonetheless find no plain error, since the evidence in this case was far from closely balanced.[3]

¶ 68    Whether the evidence is closely balanced is a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge. *People v. Sebby*, 2017 IL 119445, ¶ 60. "In determining whether evidence at trial was close, a reviewing court must evaluate the totality of the evidence and conduct in a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. "A reviewing court's inquiry involves an assessment of the evidence of the charged offense" along with "any evidence regarding the witnesses' credibility." *Id.* Where there are two opposing but credible versions of the events and neither is corroborated or contradicted by extrinsic evidence, the evidence is closely balanced. *Id.* ¶ 63.

¶ 69    Contrary to the defendant's position, in the present case the evidence is not closely balanced and does not boil down to a credibility contest. Rather, it overwhelmingly establishes that the defendant resisted Officer White's attempt to escort him to his cell thereby proximately causing the officer's injuries. The evidence at trial unequivocally established that despite being ordered to "lock up" the defendant refused to obey the sergeant's command and remained seated on the floor of the dayroom. Both correctional officers testified to this fact, and the defendant himself admitted that he was asked to "lock up" at least once before the officers attempted to lift him from the floor. In addition, it is uncontroverted that after being handcuffed and physically led toward the staircase, the defendant pushed his legs outward tripping Officer White. Both Officer

---

[3] On appeal, the defendant does not assert that the prosecutor's comments were so egregious that they affected the fairness of his trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence, so that his claim should be reviewed under the second prong of the plain error doctrine. Instead, he solely argues that the evidence was closely balanced and that he is entitled to review under the first prong. Accordingly, we need not address whether the second prong applies in this instance.

White and Sergeant Gray testified that after having to be physically led toward the staircase, the defendant swept his legs in an outward motion, thereby tripping Officer White. This testimony is directly corroborated by the surveillance video footage from the day room, which clearly shows the defendant moving his feet in an inward and outward motion, causing the officers to trip.

¶ 70    While, at trial, the defendant claimed that he was not resisting the officers but only trying to avoid the pain caused by the way they were escorting him, he admitted that he attempted to "plant his feet on the ground," after which everyone fell.

¶ 71    The evidence at trial further irrefutably established that as a result of this fall, Officer White suffered a shoulder injury, which required physical therapy, cortisone shots, and minor surgery.

¶ 72    Under this record, we are compelled to conclude that even if the prosecutor's explanation of proximate cause misstated the law, this error alone could not have tipped the scales of justice in favor of the defendant, so as to require our review of the issue under the first prong of the plain error doctrine.

¶ 73    For these same reasons, we also reject the defendant's claim that his trial counsel was ineffective for failing to object to the prosecutor's comments.

¶ 74    It is axiomatic that in reviewing claims of ineffective assistance of trial counsel we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this test the defendant must establish: (1) that counsel's performance was objectively unreasonable; and (2) that the defendant was prejudiced by counsel's conduct, *i.e.*, there was a reasonable probability that, but for counsel's errors, the outcome of the defendant's proceedings would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. The defendant must satisfy both prongs of *Strickland* and "failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35. If a reviewing court finds that the defendant was not

21

prejudiced, it may dismiss the claim on that basis alone without further analysis. *People v. Harris*, 206 Ill. 2d 293, 304 (2002),

¶ 75    As  already discussed in detail above, the evidence in the present case was not closely balanced, but rather overwhelmingly established that the defendant's actions in resisting Officer White proximately caused the officer's injuries.  Accordingly, there was no reasonable probability that, had counsel objected to the prosecutor's comments, the result of the proceedings would have been different. Since the defendant has failed to establish that he was prejudiced, his claim of ineffective assistance of counsel must fail. *Id.*

¶ 76                                        B. Sentencing

¶ 77    On appeal, the defendant next claims that the circuit court abused its discretion in sentencing him to four years' imprisonment. The defendant argues that the court failed to consider several mitigating factors, including his ongoing struggle with mental illness, his strong family support, his work history, and the full scope of his rehabilitative potential. Specifically, the defendant points out that according to his PSI, in the past, he has been diagnosed with "psychotic depression, anxiety and impulsive disorder." In addition, the defendant has a young daughter about whom he cares deeply and family members who were present during his trial. The defendant also has a high school diploma, and a certificate as a security professional, and prior work experience as a dishwasher and an assistant maintenance manager. Under these mitigating circumstances, the defendant contends that his four-year sentence was excessive. For the following reasons, we disagree.

¶ 78    It is axiomatic that the imposition of a sentence is a matter within the discretion of the trial court. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 122; see also *People v. Fern,* 189 Ill. 2d 48, 53 (1999). Because the trial court is in a superior position to judge the credibility of witnesses and

weigh the evidence at the sentencing hearing its sentencing decision is entitled to great deference and weight. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Accordingly, a sentence will not be disturbed absent an abuse of discretion. *Willis*, 2013 IL App (1st) 110233, ¶ 122; *Stacey,* 193 Ill. 2d at 209. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Johnson*, 347 Ill. App. 3d 570, 573-74 (2004).

¶ 79    The Illinois Constitution requires that "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In sentencing, the trial court must consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The trial court is given great discretion in determining a sentence within the limits set by the legislature by statute. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 63. Where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper and will be overturned only where there is an affirmative showing that the sentence departs significantly from the "spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *People v. Benford*, 349 Ill. App. 3d 721, 737 (2004); see also *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27 ("If a sentence is within the statutory range, we presume it is not excessive."); *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within statutory guidelines is presumptively valid).

¶ 80    After a review of the record, we find that the circuit court by no means abused its discretion in fashioning the defendant's sentence. In Illinois a Class 4 felony conviction for resisting or

obstructing a peace officer carries a sentencing range between one- and three-years' imprisonment. See 720 ILCS 5/31-1(a-7) (West 2018). In addition, because of his criminal history,[4] the defendant was eligible for an extended term sentence, which increased that sentencing range to between three- and six-years. See 730 ILCS 5/5-5-3.2(b)(1) (2018).

¶ 81    The circuit court sentenced the defendant to a term of four years. At just one year above the statutory minimum, the sentence was not only well-within the permissible sentencing range, but at the very low end of that spectrum.  See 730 ILCS 5/5-5-3.2(b)(1) (2018).

¶ 82    Moreover, the record reveals that in imposing this sentence, the circuit court considered all the evidence presented by the parties in mitigation and aggravation, as well as the information contained in the PSI. Accordingly, contrary to the defendant's position, the court was aware of the defendant's mental illness, education, work history, and family background as described in the PSI.  See *Willis*, 2013 IL App (1st) 110233, ¶ 123 ("If mitigating evidence is presented to the trial court, we are to presume, absent some indication to the contrary, other than the sentence itself, that the trial court considered it."). Moreover, in imposing the sentence, the court explicitly stated that it had considered the mitigating factors raised by defense counsel, which included, among other things, the defendant's history of mental illness and his ability to overcome drug addiction. As the court stated, "I'm also considering the mitigation argument you made about some of his problems, so I'm taking that into consideration as well as his age." Nonetheless, the court found that the extent of Officer White's injury, and the defendant's lack of candor during his trial testimony, which went directly to his "general moral character," necessitated a sentence above the statutory minimum. *Quintana*, 332 Ill. App. 3d at 109 (the trial court may consider the defendant's "general moral character" as a factor in aggravation).

_____

[4] The defendant's prior convictions include: (1) a 2017 Class X  aggravated vehicular hijacking; and (2) a 2008 Class 4 unlawful possession of a weapon.

¶ 83    Accordingly, where the sentence imposed was within the statutory range, and the circuit court considered the relevant mitigating and aggravating factors, and explained the rationale behind its sentence, we find no abuse of discretion. *Busse*, 2016 IL App (1st) 142941, ¶ 27; see also *Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within statutory guidelines is presumptively valid).

¶ 84                                III. CONCLUSION

¶ 85    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 86    Affirmed.